**KENNECOTT COPPER CORPORATION,**
Plaintiff,

v.

**CURTISS-WRIGHT CORPORATION,**
Defendant.

**No. 78 Civ. 1295 (LFM).**

United States District Court,
S. D. New York.

May 1, 1978.

Sullivan & Cromwell, New York City by Marvin Schwartz, Richard J. Urowsky and Robert D. Owen, New York City, for plaintiff.

Kaye, Scholer, Fierman, Hays & Handler, New York City by Paul J. Curran, Allan M. Pepper, Cynthia Cohen and Kenneth Hicks, New York City, for defendant.

OPINION

MacMAHON, District Judge.

Plaintiff Kennecott Copper Corporation ("Kennecott") brought this action on March 22, 1978 alleging multiple violations of the securities and antitrust laws by defendant Curtiss-Wright Corporation ("Curtiss-Wright"). Kennecott seeks a permanent injunction: (1) prohibiting the further solicitation of proxies and the voting of Kennecott shares and proxies now held by Curtiss-Wright at the Kennecott annual meeting set for May 2, 1978; and (2) directing Curtiss-Wright to divest itself of its holdings of Kennecott stock. Curtiss-Wright denies Kennecott's allegations and counterclaims for permanent injunctive relief prohibiting further solicitation by Kennecott and the voting of shares and proxies held by Kennecott at the May 2 meeting.

Time is of the essence due to the imminence of Kennecott's annual meeting. We, therefore, on motion of Kennecott, ordered the trial of the action on the merits to be advanced and consolidated with the hearing of the application for a preliminary injunction. Rule 65(a), Fed.R.Civ.P. The trial was held on April 24 through April 27; 17 witnesses testified and 59 exhibits were received in evidence.

I.

INTRODUCTION

This litigation is the fall-out of an ongoing proxy contest launched by Curtiss-Wright for control of Kennecott. Between November 23, 1977 and March 10, 1978, Curtiss-Wright quietly purchased some 9.9% of Kennecott's outstanding shares in transactions both on and off the national securities exchanges. Curtiss-Wright filed its Schedule 13D with the Securities and Exchange Commission ("SEC") on March 13. The schedule stated, in part, that Curtiss-Wright was "considering soliciting proxies from [Kennecott's] shareholders . . . looking to the election of directors" to Kennecott's board. Four days later, Kennecott management distributed its proxy materials, soliciting shareholders to return a proxy empowering the holder to vote the shares in favor of incumbent management.

On March 23, the battle lines were formally drawn when the Curtiss-Wright board authorized its management to wage a proxy contest to elect its own slate of directors to the Kennecott board. On April 4, Curtiss-Wright's proxy materials were mailed to Kennecott shareholders. Since that date, both sides have sent several additional communications to Kennecott shareholders. With this background, we turn now to the parties' contentions.

**956**

## II.

### RULE 14a–9(a) CLAIMS

Kennecott contends that Curtiss-Wright's proxy materials are false and misleading in several respects, in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Act") and Rule 14a–9(a) thereunder. Section 14(a) provides:

"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section [12] of this title."

Rule 14a–9(a), in turn, provides:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

▮ The elements of a private cause of action for a violation of Rule 14a–9(a) are well-established. The plaintiff must demonstrate: (1) that the proxy materials contain a false or misleading statement of a material fact or omit to state a material fact necessary in order to make the statement made not false or misleading; (2) that the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and (3) that the proxy solicitation was an essential step in effect-

ing the proposed corporate action. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 381–84 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1291–1303 (2d Cir. 1973).

### A. Omissions Respecting the Curtiss-Wright Plan

Kennecott's principal contention is that Curtiss-Wright's proxy materials were misleading due to Curtiss-Wright's knowing or negligent omission of material facts showing Curtiss-Wright's lack of due diligence in investigating the feasibility of its plan before presenting it to the shareholders as a workable program. In pertinent part, Curtiss-Wright's April 4 proxy statement explains the plan as follows:

"The [Curtiss-Wright] nominees have committed, if elected as the Board of Directors of Kennecott, to pursue a program seeking to sell its wholly-owned subsidiary, The Carborundum Company ("Carborundum") at an advantageous price and to make the proceeds available to the shareholders in the manner which, in the judgment of the Board of Directors at the time, would be most favorable to all shareholders.

The nominees believe that a sale at or above the $567 million which Kennecott paid for Carborundum only a few months ago would be advantageous from the point of view of the Kennecott shareholders. * * * They also believe that additional funds could be provided from Kennecott's cash and marketable securities and from borrowings against the $400,000,000 principal amount of 30-year subordinated income notes received by Kennecott on the sale of its subsidiary, Peabody Coal Company ("Peabody"), which notes are valued by Kennecott on its December 31, 1977 balance sheet at over $171,000,000. * * *

The nominees believe, accordingly, that it will be possible to make available sufficient funds for Kennecott either to make a pro rata distribution of approximately $20 with respect to each Kennecott share or to make a tender offer to its shareholders for 50% of the outstanding shares at a price of approximately $40 per share. Curtiss-Wright's present intention is to seek to have 50% of its shares (having an average cost of $23.42 per share) purchased in such a tender offer."

The evidence shows that T. Roland Berner, Curtiss-Wright's chairman and president, generally familiarized himself with Kennecott and other copper companies before proposing his plan to the shareholders on April 4. Berner studied the annual reports of Kennecott and its competitors and reviewed several other financial and copper industry publications. Curtiss-Wright's principal research, however, consisted of an inquiry by Charles Ehinger, Curtiss-Wright's executive vice president. So far as appears in the record, Ehinger analyzed Kennecott's balance sheets, with particular emphasis on Kennecott's cash position, and proposed to Berner several methods by which to improve it. Among other things, Ehinger suggested the sale of additional debt securities, the reduction of inventory, and the cutting of capital expenditures. As an accounting matter, Ehinger showed that Kennecott's negative cash flow would be improved in 1978 by the profits and depreciation generated by Carborundum and by Kennecott's existing carryover tax losses. Ehinger also reported that the Curtiss-Wright plan would not breach certain negative covenants in Kennecott's credit agreements if Kennecott adopted certain unspecified accounting techniques, which would maintain minimum levels of net tangible assets and stay within the maximum debt-asset ratios.

Kennecott maintains that this research is manifestly inadequate to determine whether the Curtiss-Wright plan is feasible. Kennecott points to its own in-depth research, which showed that depressed copper prices have and would continue to yield a drop in Kennecott's earnings. These lagging earnings, coupled with necessary substantial capital expenditures for the existing copper properties, will result in a severely negative cash flow for the foreseeable future. This cash position, Kennecott contends, renders a substantial cash distribution impossible, or, at least, highly perilous.

Kennecott's research further demonstrated that the Carborundum sale would not bring a price sufficient to permit a cash distribution of the magnitude proposed by Curtiss-Wright. Additional funds would have to be obtained for this purpose, and, Kennecott contends, such funds would not be readily available from banks or other conventional credit sources, or from internal economies. Finally, Kennecott notes that the proposed cash distribution would result in a default under existing credit agreements, since it would leave the company with a debt-asset ratio exceeding that permitted by the credit agreements, and with total net tangible assets falling below the minimum levels required by the agreements.

Of course, it is not for us to credit the research of one contestant over that of the other. The ultimate question of the feasibility of the Curtiss-Wright plan is beyond our province and is a decision to be made by the shareholders. *Allen v. Penn Central Co.,* 350 F.Supp. 697, 702 (E.D.Pa.1972). The significant questions for our determination are whether Curtiss-Wright used due diligence in investigating the feasibility of its plan, and whether Curtiss-Wright knowingly or negligently failed to make adequate disclosures in this regard in its proxy materials. *Allen v. Penn Central Co., supra,* 350 F.Supp. at 702; *Gerstle v. Gamble Skogmo, Inc., supra,* 478 F.2d at 1291–1303. On the evidence before us, we must answer "no" to the first question, and "yes" to the second, and we conclude that Curtiss-Wright violated Rule 14a–9(a).

The inadequacy of Curtiss-Wright's research is striking. Curtiss-Wright conducted no bona fide internal study of the feasibility of its program, nor did it retain any

outside expert to do so. It would have the Kennecott shareholders pass on the feasibility of its cash distribution on the basis of the superficial research conducted by Ehinger and Berner. Yet, Ehinger's shallow research was never committed to writing. He produced no notes, calculations or memoranda in reporting to Berner. Ehinger's work was in no way subjected to further scrutiny by other Curtiss-Wright personnel.

■ The extent of Ehinger's research, moreover, was hardly exhaustive. The feasibility of the plan was treated rather like an academic exercise involving an analysis of balance sheet data, wholly removed from the reality of Kennecott's day-to-day problems in the copper industry. We must conclude that Curtiss-Wright proceeded in an extremely cavalier manner in investigating the feasibility of its plan. Given the millions of dollars at stake, we conclude that reasonable men in the position of Berner and Ehinger would have done more to assure themselves of the feasibility of the plan. We, therefore, hold that Curtiss-Wright failed to exercise due diligence before suggesting its plan in the proxy materials.

In light of this finding, we turn to the disclosures in the proxy materials and we find them inadequate. The proxy materials failed to apprise the shareholders of the superficial nature of the investigation behind the Curtiss-Wright plan. To be sure, the proxy materials hedged with the disclaimer that "Curtiss-Wright has not made a detailed study of the consequences to Kennecott of the program described above." Under the circumstances, however, such limited disclosure is misleading because it omits to reveal the shallow and limited inquiry actually made. Clearly, the depth or shallowness of the investigation was highly material to a shareholder's decision of whether to grant or to withhold his proxy.

Quite simply, the shareholders needed more information in order to judge intelligently the question of feasibility. The Curtiss-Wright plan is reminiscent of the pot of gold at the end of the rainbow; it promises a $20 per share payment while allowing the shareholders to keep half their shares which would sell around $25. As noted above, we do not necessarily conclude that the pot of gold is illusory. We do conclude, however, that Curtiss-Wright failed to inform the shareholders that the path along the rainbow rests upon a weak foundation hurriedly pasted together by Berner and Ehinger.

Given the very shallow nature of Curtiss-Wright's feasibility studies, as well as the highly superficial appeal of the Curtiss-Wright plan, we must conclude that Curtiss-Wright omitted material facts from its proxy materials by failing to outline for the shareholders the limited extent and paucity of its feasibility investigation. There is no evidence that the omitted information was knowingly concealed, but given the magnitude of the proposal, due care required a full disclosure of the fact that the feasibility of the program had not been thoroughly investigated and was not supported by any objective research or study whatever. The omissions were thus due to negligence bordering on recklessness. As a result, the proxy materials misled shareholders to believe that the feasibility of the plan had been thoroughly studied, and the deception was aggravated by the fact that it appeared to have the imprimatur of Curtiss-Wright's proposed slate of directors, all of whom were recognized leaders in the financial community. Yet, there is no evidence that even they were aware of the shallowness of Curtiss-Wright's investigation.

There can be no doubt that the remaining elements of a Rule 14a–9(a) violation are also present. The omitted facts, going as they do to the very feasibility of the proposed corporate action, would certainly affect the judgment of a reasonable shareholder in determining how to vote. *TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 449, 96 S.Ct. 2126. Since Curtiss-Wright could not elect its own slate of directors or implement its plan without soliciting proxies, the solicitation is an essential link in effecting the corporate action. *Mills v. Electric Auto-Lite Co., supra,* 396 U.S. at 385, 90 S.Ct. 616; *Schlick v. Penn-*

*Dixie Cement Corp., supra,* 507 F.2d at 381–84. All the elements of a Rule 14a–9(a) violation being present, we hold that Curtiss-Wright violated the proxy rules in this respect.

## B. *The Teledyne Connection*

Kennecott further contends that Curtiss-Wright is controlled by Teledyne, Inc. ("Teledyne") and that Curtiss-Wright's failure to disclose that it was so controlled, in either its Schedule 13D or in its proxy materials, violates Section 13(d)(1) of the Act and Rule 14a–9(a), respectively.

The applicable definition * of "control" is set forth in Rule 12b–2, which provides:

"The term 'control' (including the terms 'controlling,' 'controlled by' and 'under common control with') means the possession, directly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

Under Rule 12b–22, however, control need not be disclosed:

"If the existence of control is open to reasonable doubt in any instance, the registrant may disclaim the existence of control and any admission thereof; in such case, however, the registrant shall state the material facts pertinent to the possible existence of control."

Thus, the question for us is whether, at the time Curtiss-Wright mailed its proxy materials to the Kennecott shareholders, "the existence of control" was "open to reasonable doubt" about Teledyne's control of Curtiss-Wright, and, if so, whether Curtiss-Wright sufficiently disclosed the underlying facts.

■ We find as a fact that at the relevant time Teledyne's control of Curtiss-Wright was open to "reasonable doubt." It is undisputed that subsidiaries of Teledyne owned, and still own, approximately 30% of Curtiss-Wright's outstanding shares. Nevertheless, the evidence here shows that over the years there has been very little contact between the sachems of Teledyne and Curtiss-Wright. Indeed, Berner testified that he and Harvey Singleton, Teledyne's top executive, have never met and have spoken to each other on the telephone only six or seven times. Further, it is clear that Teledyne has been in no way involved in Curtiss-Wright's attempt to gain control of Kennecott. Most significantly, Teledyne and Curtiss-Wright have no directors in common, and there is no evidence of any specific instances in which Teledyne or any of its subsidiaries has sought to exert influence over the actions of Curtiss-Wright. In these circumstances, we fail to see how Teledyne or its subsidiaries presently possess the power to control or direct the management or policies of Curtiss-Wright. Certainly, the existence of such power does not appear with certainty from the naked fact that Teledyne's subsidiaries own approximately 30% of Curtiss-Wright's stock. The existence of control is, therefore, open to reasonable doubt.

Thus, the question is reduced to whether Curtiss-Wright made a sufficient disclosure of the underlying facts. Curtiss-Wright's Schedule 13D disclosed that Teledyne's subsidiaries owned 30% of Curtiss-Wright's outstanding shares, and that the shares were held for investment. The schedule further stated that neither Teledyne nor any Teledyne subsidiary had sought or received representation on Curtiss-Wright's board. From these facts, a shareholder might infer that Teledyne controls Curtiss-Wright. Apparently, Kennecott has drawn such an inference. The inference, however, is by no means inescapable and, therefore, Rule 12b–22 does not mandate its disclosure. We find, therefore, that Curtiss-Wright made sufficient disclosure of the underlying facts, and conclude that Curtiss-Wright did not fail to disclose a material fact respecting control.

## C. *The Berner Press Conference*

The third claim arising under Rule 14a–9 relates to a press conference held by Berner

---

* This definition is applicable directly to the claim under Section 13(d)(1), see Rule 12b–1, and is applicable by analogy to the claim under Rule 14a–9(a).

on April 6. Kennecott suggests that the press conference amounted to a "solicitation" of proxies, which was false and misleading and, hence, in violation of Rule 14a–9 in: (i) promising, if elected, greater profits and a cash payment to Kennecott shareholders, (ii) defaming Kennecott's current management and impugning its character, and (iii) predicting success in the proxy fight.

In support of its position, Kennecott relies upon an SEC Note to Rule 14a–9, which provides in pertinent part:

> "The following are some examples of what, depending upon particular facts and circumstances, may be misleading within the meaning of this rule:
>
> (a) Predictions as to specific future market value, earnings, or dividends. .
>
> (b) Material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (d) Claims made prior to a meeting regarding the results of a solicitation."

We shall assume that the press conference was "reasonably calculated" to induce the granting of proxies and, hence, amounted to a "solicitation." See Rule 14a–1. Nevertheless, we agree with Curtiss-Wright's contention that Berner's statements, taken as a whole in the particular facts and circumstances, were neither false nor misleading, nor otherwise in violation of Rule 14a–9.

■ Rule 14a–9 in no way prohibits the expression of an honest opinion that incumbent management is incompetent. *Kass v. Arden-Mayfair, Inc.*, 431 F.Supp. 1037, 1045 (C.D.Cal.1977); *Gaudiosi v. Franklin*, 166 F.Supp. 353, 363 (E.D.Pa.1958), *aff'd*, 269 F.2d 873 (3d Cir.), *cert. denied*, 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959).

■ Much, if not virtually all, of Berner's remarks can be chalked up to such a trumpeting of the failings of the incumbents. To be sure, Berner occasionally spiced the press conference with rather unrestrained remarks, suggesting that five Kennecott directors were inside "stooges" and that Frank Milliken, Kennecott's chairman and chief executive officer, lacked the "manhood" and "guts" to account for his stewardship of Kennecott. In the context of this contest, however, we find such comments neither seriously misleading, nor "material" under *TSC Industries, Inc. v. Northway, Inc., supra.* The objectionable comments were isolated and few in number. On the whole, they were trivial indiscretions, which do not bespeak an intemperance of the magnitude prohibited by the proxy rules.

The conference, moreover, was called merely to announce Curtiss-Wright's intention to wage a proxy fight. Much more restrained and enlightening communications to the shareholders followed this press conference at points in time closer to that at which the shareholders would actually determine how to vote. Berner's remarks about the personality and attitudes of the incumbents constituted, at worst, isolated indiscretions, whose significance was certainly laid to rest by subsequent communications. See *Kass v. Arden-Mayfair, Inc., supra,* 431 F.Supp. at 1045.

Nor did Berner violate the prohibition against predictions of "future market values or dividends." To the extent Berner mentioned specific figures, he was merely setting forth Curtiss-Wright's plan for selling Carborundum and distributing the proceeds to the Kennecott shareholders. Far from being misleading, this information was necessary if the insurgent's plan was to be clearly set forth before the shareholders.

Finally, Berner's predictions of victory did not run afoul of Rule 14a–9. While the rule might be violated by a claim of sure victory calculated to induce wavering shareholders to jump upon an apparently victory-bound bandwagon, we have no such conduct here. Berner's prediction of victory cannot be regarded as anything but a claim of confidence in his own position. We doubt that such an expectable exclamation of con-

fidence would divert a reasonable shareholder from the task of coolly determining how best to vote his shares in light of the opposing platforms.

### III.

### WILLIAMS ACT CLAIM

Kennecott's next claim under the securities laws arises under the Williams Act, § 14(d)(1) of the 1934 Act. That section makes it unlawful to make a "tender offer" before filing Schedule 13D with the SEC. Since Curtiss-Wright filed such a schedule only on March 17, 1978, Curtiss-Wright would be in violation of § 14(d)(1) if it made a "tender offer" at any time prior to that date.

Kennecott contends that Curtiss-Wright's purchases of Kennecott stock between November 23, 1977 and March 10, 1978 constitute a tender offer within the meaning of the statute. Curtiss-Wright purchased 3,287,400 shares of Kennecott on 43 trading days during that period. On 17 of these days, Curtiss-Wright's purchases exceeded 50% of the daily volume of trading on the New York Stock Exchange. While substantially all of the stock was acquired on the New York Stock Exchange and other national securities exchanges, several transactions were not ordinary market purchases. White, Weld & Co. ("White, Weld"), Curtiss-Wright's broker, solicited 50 Kennecott shareholders off the floor of the exchange, consummating sales with willing sellers on the floor of the exchange. Further, Salomon Brothers, another Curtiss-Wright broker, solicited approximately a dozen institutional holders of Kennecott, consummating an unspecified number of sales off the exchange.

The term "tender offer" was deliberately left vague by Congress and the SEC. It is now well settled, however, that the term embraces not only conventional tender offers formally announced by communications to shareholders, but also more subtle activities designed to lead to an offer of shares. *Cattleman's Investment Co. v. Fears*, 343 F.Supp. 1248, 1251–52 (W.D.Okl.

1972). On the other hand, it is by now equally well settled that market purchases of stock, however aggressive, do not constitute a tender offer. See *D–Z Investment Co. v. Holloway*, [1974–75 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,771 at 96,562–63 (S.D.N.Y.1974) (citing cases). Thus, to the extent Kennecott's claim is premised upon Curtiss-Wright's market purchases of Kennecott stock, the claim is without merit.

Nor do the off-market solicitations and purchases by White, Weld and Salomon Brothers constitute a tender offer in the circumstances of this case. The most liberal definition of a tender offer is: "any offer to purchase securities likely to pressure shareholders into making uninformed, ill-considered decisions to sell." Note, *The Developing Meaning of "Tender Offer,"* 86 Harv.L.Rev. 1250, 1281 (1973).

In this case, the potential sellers of Kennecott stock were merely asked whether they wanted to sell their shares. They were offered no premium over market price. They were never given a deadline by which to decide whether to sell or not sell. Cf. *Water & Wall Associates, Inc. v. American Consumer Industries*, [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,943 at 93,759 (D.N.J.1973). Given these facts, we fail to see how Curtiss-Wright's brokers can be said to have exerted any pressure on the institutional shareholders of Kennecott.

These sellers, moreover, were largely institutions who were unlikely to be forced into uninformed, ill-considered decisions. Cf. *D–Z Investment Co. v. Holloway*, *supra*, [1974–75 Transfer Binder] Fed.Sec.L. Rep. at 96,563. These sophisticated investors have at hand large reservoirs of financial knowledge and capable staffs able to evaluate the pros and cons of a particular sale. In short, they are hardly the uninformed security holder unable to fend for himself, who needs the protection of the Williams Act. Given the lack of pressure and the absence of any likelihood of hasty, uninformed selling, we refuse to extend the concept of a tender offer to reach the purchasing activities challenged here. We hold, therefore, that Curtiss-Wright did not

make a tender offer prior to the filing of its Schedule 13D.

## IV.

### RULE 14a–6(d) CLAIM

Kennecott's final claim under the securities laws alleges a violation of Rule 14a–6(d), which provides:

"If the solicitation is to be made in whole or in part by personal solicitation, three copies of all written instructions or other material which discusses or reviews, or comments upon the merits of, any matter to be acted upon and which is furnished to the individuals making the actual solicitation for their use directly or indirectly in connection with the solicitation shall be filed with the Commission by the persons on whose behalf the solicitation is made at least 5 days prior to the date copies of such material are first sent or given to such· individuals, or such shorter period prior to that date as the Commission may authorize upon a showing of good cause therefor."

Kennecott claims that Berner orally solicited proxies from two Kennecott shareholders relying in part on written materials never filed with the SEC. The solicitations, which Berner admits, came in telephone conversations Berner had with one Robert J. Burns, and with another unnamed Kennecott shareholder. The written materials never filed with the SEC consisted of a five-year projection of Kennecott's copper industry plans, and a letter to Berner from a Mr. Bartlett, a former Kennecott employee who outlined methods of streamlining Kennecott by curtailing certain operations. The evidence showed that Berner orally requested proxies from the two shareholders after informing them of the contents of the unfiled documents.

■ We fail to perceive how the rule has been violated here. Rule 14a–6(d) requires the filing only of "material which discusses . . . *any matter to be acted upon.* . . . " The only matter to be acted upon at the Kennecott annual meeting is the election of directors. Since the docu-

ments in question here do not mention the qualifications of Curtiss-Wright's proposed slate, nor even the substance of its cash distribution plan, we find no violation of Rule 14a–6(d).

■ In any event, it has been held that the rule serves merely an administrative or procedural function and that the effect of its violation is de minimus. *Gladwin v. Medfield Corp.*, [1974–75 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,013 at 97,541 (M.D.Fla.1975), *aff'd*, 540 F.2d 1266 (5th Cir. 1976). This is certainly the case here, since the documents in question were used to solicit just two shareholders, and there is no evidence that the solicitations were even successful. Thus, even if the rule were violated, the effect of the violation calls for no substantial remedial steps.

## V.

### ANTITRUST CLAIMS

Kennecott also argues that Curtiss-Wright's takeover attempt violates Sections 7 and 8 of the Clayton Act, 15 U.S.C. §§ 18 and 19. It premises this argument on the assertion that Curtiss-Wright's joint control of the Filter Media Division of Carborundum ("Division") and National Filter Media, Inc. ("National"), a second-tier subsidiary of Curtiss-Wright, will substantially lessen competition in a particular line of commerce.

Division designs, manufactures and sells fabric filter bags for use in industrial pollution-control systems. The bags are made from cotton or one of six synthetic fibers and, as part of a complex "baghouse," filter particulate matter from gas streams directed through them. There are approximately twenty to thirty filter bag manufacturers across the country; only the five largest actively solicit sales nationwide. Division and National are among the top five manufacturers and directly compete for sales.

#### A. *Standing*

■ Curtiss-Wright challenges Kennecott's standing to bring these antitrust

claims. A private plaintiff may obtain injunctive relief against antitrust violations "only on a showing of 'threatened loss or damage'; and this must be of a sort personal to the plaintiff, *Beegle v. Thomson,* 138 F.2d 875, 881 (1943)." *United States v. Borden Co.,* 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954). The loss or damage, moreover, must be of the sort contemplated by the Clayton Act. *Brunswick Corp. v. Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Nassau County Ass'n of Ins. Agents, Inc. v. Aetna Life & Cas. Co.,* 497 F.2d 1151 (2d Cir. 1974).

■ Here, Kennecott has alleged and shown a probable impairment of its competitive position. Division has designed and constructed an unique seamless tube filter bag and is on the verge of a further design breakthrough. Disclosure of the particulars of these advances to a Division competitor would directly harm Division's position in the market by allowing the competitor to produce the products without the otherwise necessary research and development. Furthermore, Berner's directorships on both Kennecott's and Curtiss-Wright's boards would give National access to inside knowledge of these advances, as well as to other Division proprietary knowledge. See *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 867 (2d Cir. 1974). Kennecott, thus, has standing to seek the requested injunctive relief under Sections 7 and 8 of the Clayton Act.

### B. *Section 7 Claim*

Section 7 prohibits any acquisition of stock "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." Our first task in analyzing Kennecott's claim, then, is to define the product and geographic markets involved here. The purpose of defining the line of commerce is to focus the impact of the threatened combination on competition. *United States v. E. I. Du Pont de Nemours & Co.,* 353 U.S. 586, 594, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). Competition in the filter bag industry is the rivalry among producers for customers.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). Here, the relevant line of commerce is in fabric filter bags used in industrial pollution-control systems. Filter bags fill a distinct and unique niche in pollution-control technology. Pollution-control systems other than the baghouse obviously exist, but once the decision has been made to use a baghouse, filter bags are necessary components.

The sale of bags, moreover, is directed at two major classes of customers within a single market: (1) manufacturers of baghouses that install a set of filter bags in new equipment, and (2) industrial users of the equipment that must purchase replacement bags every one to three years as the used bags wear out. Both of these classes can and do turn for supplies to both the five largest nationwide suppliers, as well as to local suppliers in some instances. Both classes form a single product market, however, because there is no inherent difference between a filter bag sold to a manufacturer or an industrial user. Each bag must be built to specifications, and indeed a replacement must meet the specifications of the bag it is replacing. Under these circumstances, a single customer market is presented. *International Telephone & Telegraph Co. v. General Telephone & Electronics Corp.,* 518 F.2d 913 (9th Cir. 1975).

■ The geographic market must be drawn with fidelity to competitive realities. *Brown Shoe Co. v. United States, supra,* 370 U.S. at 336–37, 82 S.Ct. 1502. Our quest is thus directed to the geographic area of effective competition. That area depends first upon the geographic area in which competitors market the relevant product, and second upon where, within the competitive overlap the customer can practically turn for supplies. *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 359, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *Tampa*

*Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

Applying these tests, the relevant geographic market here is clearly the United States. The five largest manufacturers solicit customers and market their products nationwide. In addition, the 15 to 25 smaller companies are scattered across the country and solicit sales locally.

The market in which National and Division compete is a highly concentrated one. The evidence on market share was conflicting, but we credit Kennecott's expert that the top five filter bag manufacturers control approximately 80% of the market. The largest company controls about 23% of the market; Division, the second largest, controls approximately 16%, and National, the fifth largest, about 7% to 10%. Joint control of National and Division would thus make the combined companies the largest organization in the market, controlling 23%–26% of the market.

We find that the present market concentration and the probable market share of a jointly-controlled National and Division are sufficient to invoke the rule of *United States v. Phillipsburg National Bank*, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970). In an already concentrated market, "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *United States v. Phillipsburg National Bank, supra*, 399 U.S. at 366, 90 S.Ct. at 2045. See also *United States v. Manufacturers Hanover Trust Co.*, 240 F.Supp. 867 (S.D.N.Y.1965). A history of mergers within the market is not necessary to bring this case under *Phillipsburg National Bank. Stanley Works v. F. T. C.*, 469 F.2d 498 (2d Cir. 1972). The critical element is the market concentration. Cf. *Stanley Works v. F. T. C., supra* (49–51% domination of market by four firms is sufficient concentration to

invoke Clayton Act against a proposed merger).

Statistics reflecting market concentration and market shares cannot conclusively establish an anticompetitive effect, of course. *United States v. General Dynamics Corp.*, 415 U.S. 486, 499, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). We also, however, consider the nature of the industry, the probability that its future growth will be toward greater specialization and technology, the probability that the market's present competitive structure will continue in the future (see below), and the relative size of the present filter bag manufacturers. In light of these considerations, we conclude that common control of National and Division will so skew the competitive balance in this concentrated market that such control "is inherently likely" to substantially lessen competition.

Moreover, we conclude that Curtiss-Wright's present Kennecott holdings violate Section 7. Curtiss-Wright's acquisition of a numerical majority of Kennecott's shares is not a predicate to a Section 7 violation. *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687 (2d Cir. 1973). That section on its face prohibits the acquisition of "any part of the stock" of a corporation when there is a "reasonable likelihood" that the acquisition will have a substantial deleterious impact on competition. *United States v. E. I. Du Pont de Nemours & Co., supra*, 353 U.S. at 592, 77 S.Ct. 872. Indeed, one of the primary purposes of Section 7 is to arrest in their incipiency intercorporate relationships that would probably lead to the substantial lessening of competition. *Id.* at 597, 77 S.Ct. 872. Thus, minority share purchases may be enjoined as violative of Section 7. *Vanadium Corp. v. Susquehanna Corp.*, 203 F.Supp. 686 (D.Del.1962); *Hamilton Watch Co. v. Benrus Watch Co.*, 114 F.Supp. 307 (D.Conn.), *aff'd*, 206 F.2d 738 (2d Cir. 1953).

Here, even a Curtiss-Wright minority interest in Kennecott may substantially lessen competition in the filter bag industry. Curtiss-Wright's announced intentions, of

course, are to control Kennecott. If Curtiss-Wright fails in that, however, its present holdings and proxies may enable it to gain a directorship on Kennecott's board. That position would give it access to Division's proprietary knowledge and recent technological advances. That added competitive advantage could only substantially impair the ability of the other filter bag manufacturers to compete in this highly concentrated market.

Curtiss-Wright advances two arguments to show that its acquisition of Kennecott stock will have no such anticompetitive effects. It first argues that its inability to exercise control over National precludes any decrease in competition between National and Division. Curtiss-Wright admits that it owns 65% of the stock of Dorr-Oliver, Inc., which in turn owns 66⅔% of the common stock and all of the preferred stock of National. It asserts, however, that (1) it has never exercised control over National, and (2) that National's charter precludes its doing so. The first assertion is specious; dormant potential control may be exercised at some future time. The second assertion is simply incorrect; nothing on the face of National's articles of incorporation or by-laws forecloses Curtiss-Wright's potential control of the company.

Curtiss-Wright's second argument is similarly unpersuasive. It asserts that the ease of entry into the market will allow future competitors to enter freely and thereby change the nature of the present competitive structure. Although an individual with proper fabric and a cutting board may indeed be able to manufacture a filter bag, *successful* competition in the market demands a much greater expertise and financial commitment. The evidence indicates that quality control, technical know-how, and ability to guarantee the product are criteria by which customers choose manufacturers of filter air bags. Indeed, criteria such as these are the only explanation of the present share of concentration in a market in which superficial entry is so easy.

Accordingly, we find that the market is not one of easy entry and that its present competitive structure will remain essentially the same for the foreseeable future. Therefore, in the absence of evidence clearly showing that Curtiss-Wright's proposed takeover of Kennecott will not probably lessen competition in the filter bag market, we conclude that the proposed takeover and the acquisition of stock in anticipation thereof violate Section 7 of the Clayton Act.

## C. *Section 8 Claim*

Kennecott's Section 8 claim is based on Curtiss-Wright's attempt to have T. Roland Berner hold simultaneous directorships on Kennecott's and Curtiss-Wright's boards. Section 8 provides, in pertinent part, that:

"No person at the same time shall be a director in any two or more corporations, any one of which has capital, surplus, and undivided profits, aggregating more than $1,000,000, engaged in whole or in part in commerce, other than banks, banking associations, trust companies, and common carriers subject to the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws."

Both Kennecott and Curtiss-Wright have "capital, surplus, and undivided profits aggregating more than $1,000,000." Berner is presently a director of Curtiss-Wright. The only question remaining, then, is whether the two corporations are competitors so that their agreement to eliminate competition would constitute a violation of the antitrust laws.

There is authority that, for the purposes of this section, the business of subsidiary corporations is not to be considered in determining whether competition exists between the two parent corporations. *Paramount Pictures Corp. v. Baldwin-Montrose Chem. Co.*, 1966 Trade Cases ¶ 71,678 (S.D.N.Y.1966). That authority, however, ignores the reality of intercorporate rela-

tionships and the goal of Section 8 in preventing "a potential conflict of interest or a potential frustration of competition." *Protectoseal Co. v. Barancik*, 484 F.2d 585, 589 (7th Cir. 1973). Accord, *United States v. Sears, Roebuck & Co.*, 111 F.Supp. 614 (S.D. N.Y.1953). We, therefore, read Section 8 as prohibiting interlocking directorships between parent companies whose subsidiaries are competitors. *In re Penn Central Securities Litigation*, 367 F.Supp. 1158 (E.D.Pa. 1973). Under that reading, we find that Kennecott and Curitss-Wright are competitors under Section 8, that any agreement they would make to eliminate competition would constitute a violation of the antitrust laws, and that Berner's dual directorships would violate Section 8.

## VI.

### CURTISS–WRIGHT'S COUNTERCLAIM

Curtiss-Wright counterclaims for violations of the securities laws, seeking permanent injunctive relief against the further solicitation of proxies and against the voting of shares and proxies now held by Kennecott.

#### A. *The March 17 Proxy Materials*

Curtiss-Wright contends that Kennecott's original proxy materials, dated March 17, were false and misleading, in violation of Rule 14a–9(a), because they created an aura of "business as usual" in the face of the expected Curtiss-Wright takeover attempt. As of March 17, Curtiss-Wright owned 9.9% of Kennecott's stock and had filed Schedule 13D with the SEC. That schedule stated that, "Curtiss-Wright is considering soliciting proxies from the shareholders of [Kennecott], looking to the election of directors. . . ."

On March 17, Kennecott sent to its shareholders proxy solicitation materials which stated in turn:

"We do not know whether Curtiss-Wright will attempt such a solicitation in opposition to management or any other steps which may be contemplated or undertaken by Curtiss-Wright in the future.

You are assured that your Board of Directors and management will continue to act, as they have in the past, in what they believe to be the best interests of Kennecott and all its stockholders."

Curtiss-Wright maintains that these statements were false and misleading in failing to state that, by March 17, the Kennecott board had determined to resist any takeover attempt by Curtiss-Wright. In support, Curtiss-Wright notes that, by March 17, Kennecott had retained the services of at least one investment banking firm and at least one proxy solicitation firm, in addition to the firm named in the solicitation materials. Curtiss-Wright further points to an affidavit of Kennecott's counsel, made in connection with other matters in this suit, which admits that, at a board meeting on March 17, the board decided to resist Curtiss-Wright's takeover attempt. Finally, it points to certain evidence tending to show that Kennecott's management had used its local counsel in Utah to attempt to stymie Curtiss-Wright's efforts by inducing the Utah authorities to obtain a temporary injunction against Curtiss-Wright's alleged violations of that state's take-over statute.

There can be no doubt that by March 17, Kennecott had decided to resist Curtiss-Wright's advances. Nevertheless, as of March 17, Curtiss-Wright's precise intentions were not clear. Just two days earlier, representatives of Curtiss-Wright and Kennecott had met in an effort to attempt to avoid an all-out takeover battle. Thus, on March 17, Curtiss-Wright's precise intentions were still a matter of mere speculation, and it was not until March 23, some six days after the mailing of the Kennecott proxy materials, that Curtiss-Wright formally decided to attempt a takeover.

■ We conclude that Kennecott's disclosures were adequate in these circumstances. For Kennecott management to have disclosed its contingent resistance plans, in the face of Curtiss-Wright's rumblings, would have been counterproductive and, indeed, might itself have been misleading under the proxy rules. Kennecott's

March 17 proxy materials truthfully disclosed Kennecott's position, vis-a-vis an uncommitted Curtiss-Wright, and its disclosures were sufficient "in the light of the circumstances under which [they were] made." Rule 14a–9(a).

### B. *The Subsequent Proxy Materials*

1. *Whether Kennecott ever Studied and Rejected a Plan of Cash Distribution.*

Curtiss-Wright further contends that Kennecott's subsequent proxy materials misrepresented certain material facts. Specifically, Curtiss-Wright attacks the statement in Kennecott's March 31 letter to its shareholders that, "At the time of the Peabody divestiture your Board of Directors considered in depth what to do with the proceeds of the divestiture. * * * Among the alternatives considered was the possibility of a substantial distribution or the reacquisition of Kennecott shares. The Board concluded that this alternative would not be consistent with the maintenance of Kennecott as a viable company."

The same attack is levelled against the April 17 communication to the shareholders which, in a section entitled "Plans and Goals for the Future," Kennecott management again stated that it gave "extensive study" to, but rejected, a plan of cash distribution similar to that now proposed by Curtiss-Wright.

Curtiss-Wright's argument hinges upon a report made by Morgan Stanley & Co. ("Morgan Stanley"), Kennecott's investment banking firm, which had been retained by Kennecott at the time of the Peabody divestiture. According to the report, Morgan Stanley was retained to examine Kennecott's "priorities for using the proceeds from the sale. . . ." The report further states, however, that Morgan Stanley "[has] not been asked to deal with the question of a cash distribution to shareholders." Given this indication of the nature of Morgan Stanley's assignment, Curtiss-Wright now maintains that Kennecott never actively investigated the alternative of distributing the proceeds of the Peabody sale to its shareholders. Hence, Curtiss-Wright contends, the statements to that effect in the March 31 and April 17 proxy materials misstate a material fact.

Curtiss-Wright's argument overlooks the determinative fact present here: the assignment given Morgan Stanley by Kennecott was broader than Curtiss-Wright concedes. In full, the relevant portion of Morgan Stanley's report states:

"We have not been asked to deal with the question of a cash distribution to shareholders. However, if we feel this should be an overriding priority for the Company, we should probably make our views known to the Company."

Moreover, it is undisputed that Morgan Stanley did in fact study the alternative of distributing the Peabody proceeds to the shareholders and outlined that study, and its reasons for rejecting that alternative, in an oral report to the Kennecott board on July 15, 1977. Since Kennecott, through Morgan Stanley, actually investigated and rejected a plan of cash distribution of the Peabody proceeds, we cannot conclude that the March 31 and April 17 materials misstated facts in this regard.

2. *Other Claims*

Curtiss-Wright makes two other claims which need not long detain us. It is suggested that the proxy materials are false and misleading in stating that the Curtiss-Wright plan would breach certain negative covenants in existing credit agreements, and in making certain computations in the April 12 communication to shareholders. Both such statements, however, are supported by the record, and although the conclusions embodied in those statements can be, and are, disputed by Curtiss-Wright, we can only say they are based in fact.

### VII.

### REMEDY

### A. *Violation of the Securities Act*

Curtiss-Wright's violation of Rule 14a–9(a) mandates permanent injunctive relief prohibiting further solicitation of

proxies and the voting of shares and proxies now held by Curtiss-Wright at the Kennecott annual meeting on May 2, 1978. While a violation might be cured by a resolicitation of new proxy materials, that course is not warranted here because of the imminence of the annual meeting.

The date of the annual meeting was not arbitrarily chosen by Kennecott in an attempt to frustrate the lawful solicitation of proxies by Curtiss-Wright. Rather, it is the regular annual meeting of Kennecott shareholders at which important corporate business other than the election of directors must be conducted. Kennecott has already undergone great expense of time, effort and money in preparation for the meeting and in lawful solicitation of proxies. It would suffer a substantial hardship if the meeting were adjourned to allow time for resolicitation. Further delay and additional expense would be a waste of corporate funds · detrimental to all the Kennecott shareholders whose interests, of course, are paramount.

Moreover, in fashioning a remedy, we should not blind ourselves to the evidence respecting the merits and demerits of the Curtiss-Wright plan. See *Rafal v. Geneen* [1972–73 Transfer Binder] Fed.Sec.L.Rep. (CCH), ¶ 93,505 (E.D.Pa.1972). Viewed in its most favorable light, its feasibility is highly doubtful, and we are far from certain that the interests of shareholders require a vote on the Curtiss-Wright plan at some later date.

Weighing Curtiss-Wright's interest in adjourning the meeting, we find little that appeals to equity. There is no evidence whatever that it will suffer any financial loss on its investment in Kennnecott shares other than the expense of its futile proxy solicitation. Moreover, Berner is the author of Curtiss-Wright's predicament. He testified that he began thinking about purchasing Kennecott shares shortly after June 30, 1977, following the divestiture of Peabody by Kennecott. Curtiss-Wright, at Berner's instance, began quietly purchasing Kennecott shares in November 1977, and the purchases continued until early March 1978.

Yet, Curtiss-Wright waited until March 23, less than six weeks before Kennecott's annual meeting, to spring its takeover plan. The plan to oust incumbent management was certain to run into trouble.

Thus, it was Curtiss-Wright, under Berner's guidance, which squeezed this proxy contest and this complex litigation into a tight time frame allowing no margin for error. In doing so, Curtiss-Wright took a calculated risk that if its proxy materials were flawed, its program would not be voted upon at the May 2 annual meeting. Thus, responsibility for the eleventh hour decision of this litigation must be placed squarely on Curtiss-Wright, and it should suffer the consequences. *D–Z Investment Co. v. Holloway*, [1973–74 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,588 (S.D.N.Y. 1974); *McConnell v. Lucht*, 320 F.Supp. 1162 (S.D.N.Y.1970).

Clearly, on a balance of the equities, the interest of all the other Kennecott shareholders in going forward with the meeting, as scheduled, outweighs the interest of Curtiss-Wright in gaining delay to repair its mistakes. See *Mills v. Electric Auto-Lite Co., supra*, 396 U.S. at 386, 90 S.Ct. 616; *D–Z Investment Co. v. Holloway, supra*, [1973–74 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,588; *McConnell v. Lucht, supra*. In the exercise of our discretion, therefore, we hold that Curtiss-Wright is permanently enjoined from any further solicitation of proxies and from voting the Kennecott shares and proxies it now holds at the May 2 annual meeting and that the meeting shall go forward as scheduled.

## B. *Antitrust Violations*

■ The violations of the antitrust laws also call for a permanent injunction identical to that stated above. Kennecott further seeks an order requiring Curtiss-Wright to divest itself of the Kennecott shares. Divestiture, however, is a harsh remedy which should not be ordered without an opportunity for the presentation and consideration of less drastic alternative forms of relief appropriate to remedy the antitrust violation. See *United States v. E. I. Du Pont de Nemours & Co.*, 366 U.S. 316, 326–27, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961); *United*

*States v. E. I. Du Pont de Nemours & Co., supra*, 353 U.S. at 607–08, 77 S.Ct. 872.

The fashioning of additional appropriate relief thus calls for a further hearing for the purpose of determining the equitable relief necessary and appropriate in the public interest to eliminate the effects of the antitrust violations. See *United States v. E. I. Du Pont de Nemours & Co., supra*, 353 U.S. at 607–08, 77 S.Ct. 872; *United States v. Manufacturers Hanover Trust Co., supra*, 240 F.Supp. at 956.

### VIII.

### CONCLUSION

Accordingly, Curtiss-Wright is permanently enjoined from any further solicitation of proxies and from voting the shares and proxies it now holds at the May 2, 1978 annual meeting of Kennecott. On motion of either party, within ten (10) days from the date of this opinion, the court will set a time for a hearing to consider and determine the additional equitable relief necessary to eliminate the anticompetitive effects of Curtiss-Wright's acquisition of Kennecott shares.

The foregoing shall constitute our findings of fact and conclusions of law, in accordance with Rule 52(a), Fed.R.Civ.P.

So ordered.

