**ADVO, INC., Plaintiff,**

v.

**PHILADELPHIA NEWSPAPERS, INC. d/b/a Philadelphia Inquirer and Philadelphia Daily News, Defendant.**

Civ. A. No. 93–3253.

United States District Court, E.D. Pennsylvania.

June 10, 1994.

John R. Embick, Kittredge, Donley, Elson, Fullem and Embick, Philadelphia, PA, Margaret M. Zwisler, Dimitri J. Nionakis, Edward B. Schwartz, David T. Smutny, Howrey & Simon, Washington, DC, for plaintiff.

Judy L. Leone, Robert C. Heim, Dechert, Price & Rhoads, Philadelphia, PA, Donald T. Petrosa, Petrikin, Wellman, Damico, Carney & Brown, Media, PA, for defendant.

### ORDER AND MEMORANDUM

KATZ, District Judge.

AND NOW, this 10th day of June, 1994, upon consideration of the parties' submissions, and after a hearing, it is hereby **ORDERED** that Defendant Philadelphia Newspapers Inc.'s Motion for Summary Judgment is **GRANTED** on the federal claims and the state law claims are **DISMISSED** without prejudice.

## I. FACTS

### A. Overview

A newspaper chain is competing to distribute advertising circulars in the Philadelphia area with the country's largest full-service direct mail marketing firm. The newspaper chain's Motion for Summary Judgment raises the viability of its competitor's predatory pricing claim in this antitrust case. I find that there is no showing of a dangerous probability of achieving monopoly power in the relevant market.

Plaintiff Advo, Inc. (Advo) brings claims against defendant Philadelphia Newspapers, Inc. (PNI) for allegedly violating Section 2 of the Sherman Act.[1] Advo accuses PNI of monopolizing and attempting to monopolize the market for high density distribution of printed Advertising Materials[2] and Advertising Circulars.[3] Compl. ¶¶ 30–49. Plaintiff also brings a claim against PNI for tortious interference with Advo's contractual relations with its customers in violation of state law. Compl. ¶¶ 50–55.

Advo distributes printed advertising materials to households via mail and hand deliveries. Compl. ¶ 4. Advo is the nation's largest full-service direct mail marketing company. Def.Exh. 12. Advo's revenues in fiscal year 1993 were $911 million. Stipulated Facts, ¶ 3. Advo delivers more than 24 billion pieces of advertising annually, and reaches, on average, more than 53 million households each week. Def.Ex. 12. In October, 1992, Advo acquired CBA Shared Mail Systems, Inc. (CBA). Compl. ¶ 26. Prior to the acquisition, CBA competed against Advo in the Advertising Circulars market. Compl. ¶ 22.

Defendant PNI owns and operates the Philadelphia Inquirer (Inquirer) and the Philadelphia Daily News (Daily News). Stipulated Facts, ¶ 12. The Inquirer and the Daily News are the only two newspapers that cover the entire eight county greater Philadelphia area.[4] Pl.'s Ex. 31, p. 2. Run-of-Press (ROP) advertisements are the advertisements that are printed on newsprint and appear directly on a newspaper's editorial pages. Compl. ¶ 10. PNI serves many different ROP advertisers. Pl.'s Ex. 31, p. 5. No ROP advertiser accounts for more than five (5) percent of PNI's ROP advertising revenues. *Id.*

Broadly stated, this action concerns the market for high density advertising in the eight county greater Philadelphia area. Compl. ¶ 31, 44. For purposes of this mo-

---

1. The Sherman Act makes its unlawful for "[e]very person [to] monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States." 15 U.S.C. § 2.

2. Advo defines the "Advertising Materials market" as the market for the distribution of all printed advertising materials including Run of Press (ROP) advertising and advertising circulars. Compl. ¶ 31.

3. The "Advertising Circulars market" is the market for the high density distribution of preprinted advertising circulars. Compl. ¶ 44; see also Pl.'s

Ex. 31 at 10. Plaintiff's complaint asserts the two monopolization claims in the alternative. *See* Compl. ¶ 41. The second count asserts that PNI used its monopoly position in the ROP market to monopolize the "Advertising Circulars market" as defined above. Compl. 47.

4. The eight county greater Philadelphia area consists of Bucks, Chester, Delaware, Montgomery and Philadelphia counties in Pennsylvania, and Burlington, Camden and Gloucester counties in New Jersey. Compl. ¶ 8.

tion, the court examines three markets: 1) the Advertising Circulars market; 2) the ROP advertising market; and 3) the Advertising Materials market, including both advertising circulars and ROP advertisements. Printed advertising materials are distributed through newspapers, by direct mail and by hand delivery to consumers in the Philadelphia market. Compl. ¶ 6. Participants in these markets seek distribution of their circulars to 95 percent of the households in a targeted area. See Def.Ex. 8; Pl.'s Ex. 8, DiMartino Dep.Ex. 13, p. 6.

Advo delivers circulars in one of two ways: either shared mail or hand delivery. Companies that make deliveries in this manner are known in the trade as alternate delivery companies. Shared mail combines the circulars of multiple advertisers in one mailed package. Compl. ¶ 12. Shared mail and hand delivery packages can be targeted to specific zip codes for delivery. Compl. ¶ 12. The mix of circulars in these packages may vary from week to week and from place to place. Compl. ¶ 14.

Traditionally, newspapers included preprinted advertising circulars as inserts in their papers. These circulars, however, only reached subscribers and other purchasers of the papers. Consequently, traditional newspaper advertising circular distribution could not offer advertisers the desired 95% saturation rates achieved by alternate delivery companies. Pl.'s Ex. 8, DiMartino Dep.Ex. 13, p. 6. In response to the success of alternate delivery companies, newspaper companies like PNI developed programs to provide advertisers with circular distribution to non-newspaper subscribers by mail and/or hand-delivery. Compl. ¶ 18. These programs generally are known as Total Market Coverage (TMC) plans. Id. By 1991, ten of twelve of PNI's newspaper competitors had implemented TMC programs. Pl.'s Ex. 8, DiMartino Dep.Ex. 13, p. 6.

Principal advertisers or "base players" are key to a firm's successful entry into the Advertising Circulars market.[5] An alternate delivery company will not typically enter a new market without securing a base player. See Pl.'s Ex. 15, Kamerschen Dep., p. at 146.

In the greater Philadelphia area, there are a limited number of base players. Pl.'s Ex. 31 at p. 21. Acme and Super Fresh, two supermarket chains, are the only base players who on their own "could support an alternate delivery program" in the Advertising Circulars market.[6] Pl.'s Mem. at 11. Acme and Super Fresh are both Advo alternate delivery customers. PNI stated that until it obtains a base player for the Pennsylvania suburbs it will not be able to make a profit on its TMC program. Pl.'s Ex. 26, Rossi Dep. at 355.

Base players typically utilize ROP advertising in addition to preprinted circular distribution in their advertising plans. Base players use ROP advertising to build images, foster comparison shopping and to create multiple weekly presence. Pl.'s Ex. 31 at p. 10. In 1992, Super Fresh and Acme placed, respectively, $1,099,000 and $2,300,000 worth of ROP advertising with PNI. Id. at 34–35. Base players use advertising circulars principally as "impact" advertising to induce customers to purchase in a given week. Id. at 10.

### B. Lost Accounts & Revenues

Since 1988, PNI's Inquirer has been Advo's principal competitor for the high density distribution of advertising circulars in the relevant geographic market. Compl. ¶ 21. In the years prior to 1991, the Inquirer lost substantial advertising dollars ($10 million) to alternate delivery competitors Advo and CBA. Pl.'s Ex. 8, DiMartino Dep.Ex. 13, p. 6. Plaintiff alleges that PNI used predatory pricing of PNI's ROP advertising

---

**5.** A base player is an advertiser who advertises every single week and whose advertising circular weighs at least half an ounce. Pl.'s Ex. 15, Kamerschen Dep., p. 135. Super Fresh, Acme, Bradlees, Circuit City and Kmart are examples of base player advertisers. Stipulated Facts, ¶ 22.

**6.** PNI's National Account Sales Manager, Donald Montgomery, posited "that if you lost one [of the two accounts] you were in trouble but if you lost both you were out of business in Philadelphia." Pl.'s Ex. 22, Montgomery Dep. Ex. 15.

to induce advertisers to use PNI's TMC program.[7] Compl. ¶ 24.

In 1991, PNI developed a TMC plan to enter the Advertising Circulars market. Pl.'s Ex. 8, DiMartino Dep.Ex. 13. The goal of this plan was to position PNI as the " 'one-stop buy' for both newspaper and non-newspaper advertising in the Delaware Valley market." *Id.* at 5. At that time, PNI's biggest competitors in the Advertising Circulars market were Advo and CBA. *Id.* at 13.

PNI's TMC program was scheduled to begin in 1992. *Id.* at 3. The plan had three phases. *Id.* at 5, 20. The first phase required 18 to 24 months to develop and implement an alternate delivery network. *Id.* at 5, 10. This phase was categorized by PNI as "primarily defensive." *Id.* at 20, 22. In 1993, the TMC program was budgeted to lose $1.81 million. Def.Ex. 46, p. 325–26.

Plaintiff claims that the Inquirer sought to contract with CBA's and Advo's "base players" by offering these customers free or deeply discounted ROP advertising in conjunction with extremely discriminatorily low rates for distributing advertising circulars via PNI's TMC program. Through these offers, the Inquirer successfully induced Kmart, a principal CBA customer to cease doing business with CBA.[8] Compl. ¶ 24.

Advo identified six present or former customers that it asserts PNI solicited in violation of the antitrust laws. Def.Ex. 20, p. 2 (Advo's Supp.Resp. to Def.'s Second Set of Interrogs. to Pl.).

PNI gave advertisers with large ROP contracts credit towards their ROP contract commitments if they participated in the TMC program.[9] Def.Ex. 42. Special discounts were also targeted at key Advo/CBA customers. *See, e.g.,* Pl.'s Ex. 22, Montgomery Dep. Ex. 6 (PNI proposal to Super Fresh), Ex. 24 (PNI proposal to Acme Markets). For example, the Sunday Inquirer has "Basic Food Special Rates." Under this rate schedule, PNI sells the first full page of advertising to customers at the normal contract rate and sells the second page at a 50% discount. Pl.'s Ex. 22, Montgomery Dep.Ex. 16. PNI proposed that if Super Fresh used PNI's TMC program, it could receive a 50% discount on all Sunday Inquirer Food Section pages. *Id.* If Super Fresh accepted PNI's proposal, it would have raised its yearly advertising with PNI from $1,193,948.50 a year to $3,017,330.50 a year. *Id.* While PNI encouraged linking ROP advertising with its TMC program, *see* Pl.Ex. 22, Montgomery Dep.Ex. 15, there is no evidence in the record that advertisers were denied ROP contracts if they failed to participate in PNI's TMC program. *See* Def.Ex. 35.

Advo alleges that PNI targeted Super Fresh with predatory pricing. Compl. ¶ 27. PNI offered to distribute preprinted Super Fresh circulars for $29.00 per thousand to nonsubscribers and $32.00 per thousand for distribution by inserted preprinted circulars in the newspapers. Def.Ex. 20, p. 3. In response, Advo was forced to drop its price (from $44.00 per thousand to $36.00 per thousand) in order to maintain the Super Fresh contract. Def.Ex. 20, p. 3. Thus, in order to maintain the Super Fresh account, Advo sustained a loss of revenue. While PNI's solicitation of Super Fresh resulted in a "direct and substantial decrease in profits for Advo," it did not cause Advo to operate its contract with Super Fresh at a loss. Def.Ex. 20, p. 3; Def.Ex. 19, p. 462.

Advo alleges that PNI targeted Advo customers Circuit City and Gordon Furniture. Circuit City contracted with the Inquirer for its high density distribution of advertising circulars. Def.Ex. 20, p. 4–5. Due to PNI's solicitations, Gordon Furniture moved a substantial amount of its preprinted advertising

---

**7.** For purposes of this motion, the court assumes *arguendo* that to the extent that ROP advertising constitutes a separate market (the "ROP market") from the Advertising Circulars market, PNI has monopoly power over the ROP market. *See* Def.'s Mem., p. 33 n. 24; *see also*, Pl.'s Ex. 8, DiMartino Dep. Ex. 13, p. 13 ("PNI, with advertising revenues of nearly $300 million, controls the dominant advertising mediums in the Philadelphia market.").

**8.** Advo does not assert a claim against PNI for soliciting Kmart in violation of the Sherman Act. *See* Def. Ex. 20, p. 2.

**9.** PNI maintains rate cards that list the standard ROP rates that PNI charges by the inch. Stipulated Facts, ¶ 17.

circular distribution business from Advo to PNI. *Id.* at 4.

The plaintiff alleges that PNI also enlisted other competing newspapers to distribute the Acme account. Compl. ¶ 29. While Advo did retain the Acme account, the plaintiff maintains that it did not receive an anticipated four to five percent rate increase from Acme due to PNI's conduct. Def.Ex. 19, p. 194–95; Def.Ex. 20, p. 4. Nevertheless, Advo is currently making a profit of between $250,000 and $500,000 on the Acme account. *Id.* Similarly, the plaintiff alleges that it was unable to secure rate increases from Bradlees and Fleming Foods due to PNI's actions. Def.Ex. 20, p. 5.

Advo asserts that if PNI continues to offer Advo customers "predatory rates for distribution of preprints and leveraging of its mo-nopoly power in ROP by linking saving in ROP to distribution of preprints," the financial consequences "would be so severe as to cause Advo to exit the Philadelphia market." Def.Ex. 31, p. 36.

## C. Ease of Market Entry

■ Advo claims that the barriers to entry [10] in this market are high.[11] Advo asserts that PNI maintains a 57.6 percent market share of the ROP market and a 40.1 percent market share of the Advertising Circulars market.[12] Pl.'s Ex. 31, Beyer Report Ex. 12. Advo/CBA does not participate in the ROP market and maintains a 31.3 percent market share of the Advertising Circulars market.[13] *Id.* The other competitors in the relevant markets are other daily newspapers,[14] South Jersey Shoppers Guide, both paid and non-

**10.** There are two alternative definitions of "entry barriers." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 409 (1993 Supp.). Under the "Stiglerian" definition, a barrier to entry is identified by "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants." *Id.* Under the "Bainin" definition, entry barriers are factors in the market that deter entry while permitting incumbent firms to earn monopoly returns. *Id.*

**11.** The entry question focuses on whether competitors will choose to enter the relevant market in the event of supracompetitive pricing by PNI, not on whether this particular plaintiff would choose to reenter the market, if it first chooses to leave the Philadelphia market due to PNI's alleged predatory conduct. *See Chillicothe Sand & Gravel v. Martin Marietta Corp.*, 615 F.2d 427, 431 (7th Cir.1980) (monopoly pricing must be assessed in light of its effect on competition rather than on a competitor). Plaintiff's expert opines that predation "might" discourage entry. Pl.'s Ex. 25, Rapp Dep. p. 263; *see also*, Pl.'s Surreply Ex. 6, Rapp. Dep Ex. 7 p. 602–03 ("The 'bodies on the lawn' problem does not mean that recoupment can never be disproved by invoking the structural facts. Rather, this line of research has shown that there are specific market circumstances in which invoking easy entry is not enough to dispel the **possibility** of recoupment from a predatory pricing campaign.") (emphasis added).

Advo chose not to reenter the Hartford market because "Hartford regional resources would be better spent developing more potentially lucrative opportunities in Boston, Long Island and New York City." Pl.'s Ex. 15, Kamerschen Dep. Ex. 3, p. 1. Plaintiff has not demonstrated a predicate for using the Hartford market experience as a predictor of the likelihood of reentry into the Philadelphia market if Advo withdraws due to PNI's predatory pricing. Plaintiff's withdrew from the Hartford market because of its "lackluster performance." *Id.* at 1, 8. After its exit, a new entrant became "quickly profitable." *Id.* at 8.

**12.** High market share does not necessarily demonstrate an entry barrier. Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 518.3b (1993 Supp.); *see also*, *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 201 (3d Cir. 1992) ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power."), *cert. denied*, — U.S. —, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993).

**13.** The total estimated market revenues for the entire ROP market are $242,478,172. Pl.'s Ex. 31, Beyer Report Ex. 12. The total estimated market revenues for the entire Advertising Circulars market are $109,171,869. *Id.*

To the extent to which there is a single Advertising Materials market (combining the ROP and Advertising Circulars markets), the total estimated market revenues for this market would be $351,650,041. *See Id.* PNI's revenues of $183,357,403 equal a 52.2 percent share of this market. *See Id.* Advo's revenues of $34,161,665 equal a 9.7 percent market share.

**14.** Twelve major suburban daily newspaper serve the greater Philadelphia market. Pl.'s Ex. 31, Beyer Report Ex. 15, p. 1. Ten of these newspapers have entered the Advertising Circulars Market. Pl.'s Ex. 8, DiMartino Dep. Ex. 13, pp. 6 and 2–A. These newspapers have a 13.3 percent share of the Advertising Circulars market. Pl.'s Ex. 31, Beyer Report Ex. 12.

paid weekly newspapers, and Shoppers.[15] *Id.*

In 1989, Super Fresh, an Advo customer, became unhappy with Advo. Def.Ex. 3, p. 128. Super Fresh contacted CBA about entering the Philadelphia market.[16] Def.Ex. 5, pp. 20–22. At that time, CBA operated in the northern New Jersey and Long Island markets, but not in the Philadelphia market. *Id.* at 21–22. At Super Fresh's urging, CBA entered the Philadelphia market and within five months created a program that reached two million households each week.[17] Def.Ex. 8. In the first five month period, CBA signed exclusive contracts with Caldor, Channel and Ames in addition to a contract with Super Fresh. *Id.* Within this same period, CBA also recruited Shop–Rite, Bradlees, Shop N Bag, Pharmor, Modell's, Thriftway, McCrory's, Sears, Rickel, JC Penney, and Mr. Goodbuys as regular customers. *Id.* A conclusory contention that entry is difficult[18] is no substitute for these facts.

In deposition testimony, Advo's President stated that a couple of months would be a reasonable period for someone to enter a new market and turn a profit. Def.Ex. 18, p. 114.

## II. DISCUSSION

The plaintiff's complaint asserts three different claims against the defendant. In Count One, Advo accuses PNI of monopolizing and attempting to monopolize the market for high density distribution of printed Advertising Materials. In Count Two, Advo accuses PNI of monopolizing and attempting to monopolize the market for high density distribution of printed Advertising Circulars. In Count Three, Advo accuses PNI of tortiously interfering with Advo's contractual relations with its customers in violation of state law. The court will address each count in turn.[19]

## A. Count One

To succeed on Count One, Advo must show that PNI possessed or could possessed monopoly power "in the relevant market." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 197 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). "The relevant product market is defined as those commodities reasonably interchangeable by consumers for the same purposes." *Id.* at 198.

The plaintiff has failed to show that a genuine issue of material fact exists as to the existence of the "Advertising Materials market" as defined in Count One of the Complaint. The plaintiff's expert report does not support the existence of an "Advertising Materials market." The plaintiff's expert has concluded that "there are **two** relevant product markets for the distribution of printed advertising in the Philadelphia area: ROP (run-of-press) advertising and preprinted ad-

---

**15.** "Shoppers" are free weekly newspapers that contain less than 10 percent editorial content. Pl.'s Ex. 31, Beyer Report Ex. 15, p. 7–8. Shoppers have a 7.0 percent share of the Advertising Circulars market. Pl.'s Ex. 31, Beyer Report Ex. 12.

**16.** There are more than 100 alternate delivery companies of various sizes serving advertisers throughout the United States. Def. Ex. 33.

**17.** CBA's start-up costs were approximately $3 million. Pl.'s Ex. 20, Matzner Dep. at p. 53; Def. Ex. 34, p. 17. It took CBA 14 months to make a profit. *Id.* at 108. On October 14, 1992, Advo acquired CBA's Philadelphia operations for $4.93 million. Stipulated Facts, ¶ 8.

**18.** Pl.'s Ex. 20, Matzner Dep. at p. 20.

**19.** For an extensive discussion of the standard of review on a motion for summary judgment see

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter. Rather it determines whether or not there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. The moving party has the burden of showing there are no genuine issues of material fact, *Gans v. Mundy*, 762 F.2d 338, 340–41 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985), and the non-moving party may not rely merely upon bare assertions, conclusory allegations or suspicions. *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982).

vertising." Pl.'s Ex. 31 at 9 (emphasis added). *These two product markets are different. Id.* at 10. Advertisers use ROP advertising and preprinted advertising to achieve different goals. *Id.* The products are not interchangeable. Additionally, the plaintiff summarizes its claim against the defendant as one of "predatory pricing" and use of PNI's "monopoly power over 'ROP,' or run-of-press, advertising to drive Advo from the eight-county Philadelphia metropolitan **preprint** market." Pl.'s Mem. p. 1 (emphasis added). These contentions go to Count Two which concerns monopolization of the Advertising Circulars market. Since no genuine issues of material fact in the record support the existence of a single "Advertising Materials" market, judgment in favor of the defendant on Count One is appropriate.

## B. Count Two

■ In order to prevail on its monopolizing and attempt to monopolize the Advertising Circulars market claims as alleged in Court Two, the plaintiff must prove that (1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, —— – ——, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993); *Pastore v. Bell Tel.*

*Co. of Pa.,* 24 F.3d 508, 511 (3d Cir.1994). For the purposes of this motion, the court will assume *arguendo* that there are genuine issues of material facts with respect to the first two elements.[20] Accordingly, the issue is whether plaintiff has made a showing that PNI poses a dangerous probability of monopolizing the Philadelphia Advertising Circulars market. *Brook Group, Inc. v. Brown & Williamson Tobacco Corp.,* —— U.S. ——, ——, 113 S.Ct. 2578, 2587, 125 L.Ed.2d 168 (1993); *Pastore,* 24 F.3d at 513.

■ Advo has not shown that PNI's 40.1 percent market share establishes monopoly power in the relevant market.[21] *See Fineman,* 980 F.2d at 201–02 (a significantly larger market share than 55 percent is required to demonstrate *"prima facie* monopoly power"). Monopoly power[22] is the power "to force a purchaser to do something that [the purchaser] would not do in a competitive market." *Eastman Kodak Co. v. Image Technical Serv., Inc.,* —— U.S. ——, ——, 112 S.Ct. 2072, 2080, 119 L.Ed.2d 265 (1992). The major customers or "base players" in the Advertising Circulars market, such as the supermarkets and discounters, are highly sophisticated buyers who have significant countervailing economic power.[23] Plaintiff is a vibrant and aggressive competitor in the market.[24] It controls 31.3 percent of the Advertising Circulars market. It has the

**20.** The court notes that there is nothing inherently predatory about basing a discount on an advertiser's total volume of business. Each sale increases marginal profitability. *See O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340, 351 (3d Cir. 1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982). Assuming that PNI intended to monopolize the relevant market, this fact alone is not sufficient to establish the dangerous *probability of success that is the object of the Sherman Act's section 2 prohibition of attempts. Pastore,* 24 F.3d at 513.

**21.** Although the size of a defendant's market share is a significant determinant of whether a defendant has a dangerous probability of successfully monopolizing the relevant market, it is not the exclusive factor. *Barr Lab. Inc. v. Abbott Lab.,* 978 F.2d 98, 112 (3d Cir.1992); *see also, Fineman,* 980 F.2d at 201–02. Other factors to be considered include the strength of competition, *probable development of the industry,* the barriers to entry, the nature of the anti-competi-

tive conduct, and the elasticity of consumer demand. *Id.*

Because PNI has conceded for purposes of this motion that it has monopoly power over the ROP market, the court assumes that PNI already charges or can charge ROP advertisers whatever price it believes will maximize its profits.

**22.** "Market power" is a synonym for "monopoly power." *International Distrib. Ctrs., Inc. v. Walsh Trucking,* 812 F.2d 786, 791 n. 3 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987).

**23.** See discussion *supra* I.C.

**24.** The court notes that when PNI undercut Advo's price, Super Fresh chose to remain an Advo customer, despite Advo's comparatively higher price. See Def. Ex. 20, p. 3. The inelasticity of demand in this market, i.e., relatively low sensitivity to just price as a determining factor in relationships, 'blunts predatory pricing

majority (5 out of 6) of the supermarket base players under contract. *See* Pl.s' Ex. 15, Montgomery Dep.Ex. 15. Moreover, the record demonstrates that when customers in the Advertising Circulars market are unhappy with one supplier they will seek and be able to acquire the services of a new supplier, even if, as in the case of CBA, this new supplier is not presently competing in the market. *See, e.g.,* Def.Ex. 5, Gasparro Dep. pp. 60–62.

Entry into the Advertising Circulars market is comparatively easy. See Def.Ex. 1, pp. 29, 81; Def.Ex. 18, p. 114;[25] Def.Ex. 39, ¶ 7.[26] Ten of PNI's twelve newspaper competitors have entered the market and obtained a 13.3 percent market share. Pl.'s Ex. 8, DiMartino Dep.Ex. 13, pp. 6 and 2–A; Pl.'s Ex. 31, Beyer Report Ex. 12. As CBA demonstrated by creating in five months a program that reached two million Philadelphia households,[27] the market can successfully be entered in well under a year with the support of a single base player.[28] *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 518.3b (1993 Supp.) (one year standard for determining ease of entry into market); *cf. Barr Lab. Inc. v. Abbott Lab.,* 978 F.2d 98, 113 (3d Cir.1992) (six-month to two-year waiting period to enter pharmaceutical drug market is not significant barrier to entry). Moreover, with annual revenues in excess of $100,000,000, Pl.'s Ex. 31, Beyer Report Ex. 12, CBA's initial three million dollar investment required to enter the Advertising Circulars market is not significant.[29] *Cf. International Distrib. Ctrs., Inc. v. Walsh Trucking,* 812 F.2d 786, 792–93 (2d Cir.) (relatively large capital outlays for trucking industry do not constitute significant entry barriers), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). While plaintiff contends there are reputational barriers to entry, the record translates this notion into a lower level of abstraction, i.e., management and selling skills. Pl.Advo, Inc.'s Surreply to Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J., Ex. 1 Matzner Dep. p. 54; Ex. 2 Schiro Dep. pp. 48–61, 73–75. Such competence is a prerequisite to enter any business, not a special or significant entry barrier to this one.

The plaintiff's basic complaint is that PNI engaged in unilateral price competition caus-

as a weapon. See *supra* note 19 and pp. 372–373.

**25.** Joseph P. Durrett, Advo's President and Chief Operating Officer, was asked the following question during his deposition:

> So it's your testimony that you think a reasonable time period for someone coming into a market and starting up a new market they should be able to turn a profit within a couple of months?

Mr. Durrett answered: "Yes." Def.Ex. 18, p. 114.

**26.** In an earlier antitrust action, *Cassidy Distrib. Serv. v. Advo–Systems, Inc.,* Civ. Action No. 84–3464, 1987 WL 43368 (E.D.Pa.1987), Advo's expert concluded that:

> Entry into the market is comparatively easy. Little initial capital is required relative to many other businesses. Mailing lists and operational expertise are available from many sources. Indeed, clients of ADVO could individually or in groups easily enter the production of a service much like that of ADVO if ADVO and competitors attempted to charge unreasonable, supracompetitive prices. In fact, entry into the "shared mail" business appears to be proliferating. This takes several forms. For example, third class bulk mailers have started new, directly competitive shared mail programs or have expanded prior programs. Newspapers are using third class mail for total market coverage ("TMC") of advertising inserts as a supplement to their regular subscriber base. And, in addition, many utilities and credit card companies use a form of "shared mail" with their billings. Def. Ex. 39, ¶ 7.

Although plaintiff claims that this finding is not supported by subsequent developments of the Advertising Circulars market, it points to no such developments which would vitiate the finding.

**27.** *See* discussion *supra* p. 373.

**28.** PNI's failure to attract sufficient business in the Advertising Circulars market to make a profit demonstrates the competitive nature of the market.

**29.** The case at bar is distinguishable from *Kelco Disposal, Inc. v. Browning–Ferris Indus. of Vermont, Inc.,* 845 F.2d 404 (2d Cir.1988), *aff'd* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). In *Kelco,* the costs of entering a $440,000 market exceeded $300,000. *Id.* at 408. Moreover, the *Kelco* defendants' market share was always greater than 55% and at one time was 100%. *Id.* at 409.

The court notes that CBA's initial three million dollar investment turned into a significant profit when CBA sold this part of its business to Advo for $4.93 million in October, 1992. Stipulated Facts, ¶ 8.

ing Advo to lose profits. *See Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 205 (3d Cir.1992) (the Sherman Act "does not proscribe anti-competitive unilateral conduct that falls shy of threatened monopolization"), *cert. denied,* —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). Section 2 makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so. *Spectrum Sports,* —— U.S. at ——, 113 S.Ct. at 890; *Pastore,* 24 F.3d at 513. The antitrust laws protect competition, not competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Consumers benefit from unilateral competition. *See Brook Group,* —— U.S. at ——, 113 S.Ct. at 2588. "To hold that the antitrust laws protect competitors from the loss of profits due to ... price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share." *Id.*

Application of the antitrust laws to price competition requires caution to avoid costly, mistaken inferences. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,* 881 F.2d 1396, 1403–04 (7th Cir.1989) ("courts should treat with great skepticism complaints by competitors who are injured by low prices that customers adore, when the customers are content."), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990).

■ A prerequisite to hold a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had a dangerous probability of recouping its investment in below-cost prices.

*Brook Group,* —— U.S. at ——, 113 S.Ct. at 2588. In other words, a successful monopolist must be able to sustain charging supracompetitive prices. *Matsushita Elec. Indus. Co.,* 475 U.S. at 589, 106 S.Ct. at 1357 ("[I]t is not enough simply to achieve monopoly power, as monopoly pricing may breed quick entry by new competitors eager to share in the excess profits."). Evidence of below-cost pricing is not alone sufficient to permit an inference of probable recoupment and injury to competition. *Brook Group,* —— U.S. at ——, 113 S.Ct. at 2589. "[T]he success of any predatory scheme depends on maintaining monopoly power long enough to recoup the predator's losses and to harvest some additional gain." *Id.,* —— U.S. at ——, 113 S.Ct. at 2592.

Even if there is a genuine issue of material fact as to whether PNI operated its TMC program at a loss during the relevant time period,[30] the nature of the Advertising Circulars market suggests that recoupment is not a dangerous probability.[31] *See Id.,* —— U.S. at ——, 113 S.Ct. at 2589 ("plaintiff must demonstrate that there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation."); *A.A. Poultry Farms,* 881 F.2d at 1401 ("Only if market structures makes recoupment feasible need a court inquire into the relations between price and cost."). Advo did not buy protection against vigorous competition in the market when it acquired CBA, its former competitor.[32] *See Spectrum Sports,* —— U.S. at —— – ——, 113 S.Ct. at 891–92 (The Sherman Act "is not to protect businesses from the working of the market; it is to protect the public from the failure of the

---

**30.** The court notes that "[a] seller faced with a choice of making a sale at above marginal costs but below total costs, or foregoing the sale, will choose to make the sale. Such a profit maximizing sale cannot be indicative of predatory intent." *O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340, 351 (3d Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982).

**31.** Any alleged "recoupment" from PNI raising its ROP rates at some later point is irrelevant. The ROP market is a separate and distinct market from the Advertising Circulars market. Because this court assumes that PNI has a monopo-

ly over the ROP market, PNI already has the power to maximize its profits in the ROP market.

**32.** Advo's Philadelphia Region saw the acquisition of CBA as its "Single Greatest Strategic Accomplishment" for fiscal year 1993, because the acquisition eliminated a competitor. Def. Ex. 13. Advo's Atlantic Division also saw the acquisition of CBA as its "Single Greatest Strategic Accomplishment" for fiscal year 1993, because the acquisition "prevented [a] major pricing war." Def.'s Reply Br., Ex. 3.

market."); *Brook Group,* —— U.S. at ——, 113 S.Ct. at 2588 ("That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured.").

■ This is not a case of tying abuses by a monopolist. *Cf. Eastman Kodak Co. v. Image Technical Serv., Inc.,* —— U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least that he will not purchase that product from any other supplier." *Id.,* 112 S.Ct. at 2079. While evidence suggests that PNI offered ROP discounts to companies that participated in the TMC program, nothing suggests that PNI required advertisers to purchase ROP advertising in order to participate in its TMC program. Additionally, advertisers who purchased ROP advertising in the Inquirer and Daily News were free to, and did, place their advertising circular business with PNI, Advo, and other competing companies.

■ The plaintiff cannot maintain this action based upon a monopoly leveraging theory. In order for Advo to prevail upon a theory of monopoly leveraging, Advo must prove more than a mere "competitive advantage" by PNI in the advertising circulars market based on its monopoly position in the ROP market. *See Fineman,* 980 F.2d at 204. Advo would have to prove threatened or actual monopoly in the leveraged market (i.e., the advertising circulars market) by PNI to prevail.[33] *Fineman,* 980 F.2d at 206; *see also Alaska Airlines, Inc. v. United Air-*

*lines, Inc.,* 948 F.2d 536, 547 (9th Cir.1991) (the *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), monopoly leveraging doctrine rejected as an independent theory of liability under Section 2). For the reasons enumerated above, there is no dangerous probability that a monopoly will be created by PNI's alleged leveraging conduct.

### C. Count Three

The state law claim for tortious interference is dismissed without prejudice because the court declines to exercise supplemental jurisdiction when the federal claims have been disposed of at this stage.[34] *See Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1284 (3d Cir.1993); 28 U.S.C. § 1367(c)(3).

### III. CONCLUSION

The bottom line is that this is a case about price competition. The antitrust law does not protect competitors against even what may be perceived as unfair, unilateral price cutting below cost designed to drive those competitors out of business, absent a dangerous probability of achieving monopoly power. Because this result is harsh, a jury might reach a verdict which could not stand, based on sympathy, after an expensive trial. To avoid discouraging competition, courts are skeptical of antitrust claims where consumers and the public benefit from lower prices. Given the history of this market, its competitors and powerful buyers, it would be sheer speculation to posit a dangerous probability

---

**33.** The *Fineman* court explicitly rejected the Second Circuit's monopoly leveraging theory articulated in *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). *Fineman,* 980 F.2d at 206.

*SmithKline Corp. v. Eli Lilly and Co.,* 575 F.2d 1056 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978) is distinguishable from the case at bar. In *SmithKline,* all the drugs in issue were part of a single relevant product market—the cephalosporin market. 575 F.2d at 1065. Additionally, the defendant controlled from 100% to 89.8% of the cephalosporin market and the barriers to entering the market were substantial (plaintiff's entry required five-

year $20,000,000 research and development program). *Id.* In contrast, in the case at bar, the ROP market and the Advertising Circulars market constitute two separate product markets and the defendant only maintains a 57.6 percent market share of the ROP market and a 40.1 percent market share of Advertising Circulars market. Pl.'s Ex. 31, Beyer Report Ex. 12. Additionally, the Advertising Circulars market entry barriers are much less severe.

**34.** The plaintiff's complaint asserts that this court has jurisdiction over the subject matter of this suit pursuant to 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1331 (federal question jurisdiction), 1337 (commerce and antitrust jurisdiction) and 1367 (supplemental jurisdiction). Compl. ¶ 2.

of defendant's achieving monopoly power in the Philadelphia area advertising circular distribution market.