

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-1995

# Advo v Phila Newspapers Inc

Precedential or Non-Precedential:

Docket 94-1812

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Advo v Phila Newspapers Inc" (1995). *1995 Decisions.* Paper 97.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/97

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

───────────

No. 94-1812

───────────

ADVO, INC.,
                    Appellant

v.

PHILADELPHIA NEWSPAPERS, INC.,
d/b/a PHILADELPHIA INQUIRER;
PHILADELPHIA DAILY NEWS

───────────────

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civil Action No. 93-3253)

───────────────

Argued February 13, 1995

BEFORE:  STAPLETON, GREENBERG and COWEN, Circuit Judges,

(Filed: April 14, 1995)

───────────────

John DeQ. Briggs (argued)
Margaret M. Zwisler
Jerrold J. Ganzfried
Richard A. Ripley
Howrey & Simon
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
David M. Steger
Advo, Inc.
One Univac Lane
Windsor, CT 06095

                    Attorneys for Appellant

Robert C. Heim (argued)
Richard C. Rizzo
Judy L. Leone
George G. Gordon
Dechert Price & Rhoads
1717 Arch St.
4000 Bell Atlantic Tower

Philadelphia, PA 19103

Attorneys for Appellee

Anne K. Bingaman
Assistant Attorney General
Diane P. Wood
Deputy Assistant Attorney
General
Catherine G. O'Sullivan
David Seidman
U.S. Department of Justice
10th & Pennsylvania Ave., N.W.
Washington, DC 20530

Attorneys for Amicus
Curiae United States of
America

OPINION OF THE COURT


GREENBERG, Circuit Judge.

Appellant Advo, Inc. sued appellee Philadelphia Newspapers, Inc. ("PNI") charging that PNI attempted to monopolize the market for delivering preprinted advertising circulars in the greater Philadelphia area, in violation of section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.  Advo alleged that PNI has offered predatorily low prices to major purchasers of services for delivering circular advertising, and that, in light of specific features of the market, PNI's scheme to force Advo from the market has a dangerous probability of succeeding.

After extensive discovery, the district court entered summary judgment in favor of PNI.  Because we concur that PNI

could not have recouped the investment in predation it might have made, and because Advo failed to present evidence that could support a finding that PNI either priced below cost or had a specific intent to monopolize, we will affirm.

## I.   Introduction

### A.   Factual Background

#### 1.  General Features of the Market for Retail Advertising

Before presenting the specific facts of this case, we find it useful to provide general information on the relevant advertising markets.  Until recent decades, grocery stores, discount stores, hardware stores, and other large retailers promoted their goods primarily through newspapers.  They used two kinds of advertisements.  Those appearing directly on newspaper editorial pages are called "run of press" ("ROP") advertising.  Separate pieces of paper included with the newspaper (e.g. supermarket multi-page ads) are called "circulars" or "preprints."

Retailers found newspaper advertising wanting in two ways.  First, it provides only limited "penetration" into an area's households.  For example, in Philadelphia the major daily newspapers reach only 25.4% percent of the households and even the Sunday paper reaches only 49.1%.  Second, newspaper advertising cannot focus on specific neighborhoods within a large metropolitan area.  To give a concrete example of both of these shortcomings, a supermarket chain understandably wants its

advertisements to reach every household within close proximity to its stores. Newspaper advertising, be it ROP or preprint, cannot provide such targeted saturation coverage.

In response to these shortcomings, literally hundreds of "marketing communications" services ("MC services") have sprung up over the last 30-odd years. Taking advantage of comprehensive computer databases containing the addresses of every household in a region, they have been able to provide almost complete penetration in delivering advertising materials, be it in an entire metropolitan area or within, e.g., specific zip code areas. These services, of course, deliver only preprints since they do not publish any sort of newspaper. The dispute in this case involves the delivery of print advertising for retailers targeted at consumers within a metropolitan area.

MC services deliver either by United States mail or by hiring delivery people to walk door-to-door and hang bags of preprints on doorknobs. The former is often called "shared mail"; the latter is known as "alternate delivery." Some costs are common to both methods; e.g. computerized mailing lists, and labor to stuff preprints into packets and sort the packets in order of delivery. Alternate delivery involves other significant fixed costs. In addition to hiring delivery persons and planning their routes, management must employ a second tier of "verifiers" to perform spot-checks and ensure that delivery employees simply are not dumping their packets into the first available dumpster.

Because mail rates increase with the weight of the advertising packets, alternate delivery becomes attractive,

despite these high fixed costs, as an MC service attracts more customers.  Once delivery and verification staff are in place, the incremental costs of adding more advertising material to the packet are minimal.

To cover the high fixed costs of alternate delivery, or even the lower but still significant fixed costs incurred in mail delivery, MC services need "base players" that distribute large numbers of circulars on a routine basis.  Supermarket chains, which depend on multi-page weekly circulars to attract shoppers, are one of the most important types of base players.  Large discount chains, such as K-Mart, also play this role.  There are, of course, only a small set of such base players in a given metropolitan area.

**2. Advo and the Philadelphia Market for Preprint Advertising**

Advo is a national MC services company and is the largest full-service direct mail marketing company in the country.  It distributed at least three <u>billion</u> advertising packages in 1992, generating nearly a billion dollars in revenue.  Advo began operating in the eight-county area that comprises the Philadelphia market[1] in the mid-1960s, and appears to have grown

---

[1].  The parties stipulate that the relevant geographical market in this suit consists of the following eight counties: Philadelphia, Bucks, Montgomery, Chester, and Delaware counties in Pennsylvania; Camden, Burlington, and Gloucester counties in New Jersey.  This is the same area as the Census Bureau's Philadelphia Primary Metropolitan Statistical Area.

rapidly since obtaining the Acme supermarket chain as a base advertiser for shared mailings in 1983.

Ironically, Advo faced a Sherman Act section 2 suit as a result of capturing the Acme account and expanding its business in Philadelphia. Cassidy Distrib. Serv. v. Advo-Sys., Inc., No. 84-3464 (E.D. Pa. 1984). A small competitor that previously had serviced Acme sued Advo charging predatory conduct in furtherance of a plan to monopolize the market for distributing advertising circulars in the region. In the course of countering this charge, Advo argued that there are few, if any, barriers to entering the business of marketing communications, and thus there is little, if any, chance that a predator could recoup the costs of illegally obtaining a monopoly. See app. at 1772-1908, 2317-2340, 2341-2348.

The market for circular advertising distribution appears to have become more competitive in recent years. When Advo changed its delivery schedule in 1989 to accommodate Acme, other major customers became dissatisfied and invited CBA, a MC services company from outside the area, to enter the Philadelphia market. Despite start-up costs of over $3,000,000, CBA turned a profit within 14 months. In a move admittedly taken to avert a "price war," Advo acquired CBA's Philadelphia preprint distribution operations in 1992. This acquisition apparently encountered no antitrust scrutiny.

### 3. The Effect of Marketing Communications Services on Major Philadelphia Newspapers, and Their Response

Much of Advo's growth has come at the expense of PNI, publisher of the Philadelphia market's major daily newspapers, The Philadelphia Daily News and The Philadelphia Inquirer. PNI estimates that it has lost at least $4,000,000 per year in ROP and circular advertising to Advo and similar competitors.

To counter Advo's advantages in market penetration and the ability to target specific neighborhoods, PNI in 1991 began working on a "total market coverage" ("TMC") program to supplement ROP advertising with alternate delivery to non-subscriber households. PNI started implementing the program in small stages by 1992. Although it faced substantial start-up costs, PNI claims that it hoped to turn a profit on its TMC program by 1995.

Facing the same cost structure as Advo, PNI needed a base player to help cover the high fixed costs of delivering preprinted advertising packets door-to-door. In September 1992, and again in January of 1993, PNI offered to distribute circulars for the Super Fresh supermarket chain, a major Advo customer, for about $30 per thousand circulars. As part of its proposal, PNI offered discounts on ROP advertising tied to the total volume of advertising that Super Fresh purchased. Advo retained the account by cutting its rate by about 37%, from $58 to $36 per thousand circulars. Thus, Super Fresh retained Advo despite its base rate exceeding that in PNI's proposal by about 20%. Although the expert opinion testimony is conflicting, there

appears to be no _factual_ basis to Advo's claim that PNI's proposed prices were below its costs.  There is also no support for Advo's claim that PNI tendered Super Fresh prices below those offered to comparable advertisers.

PNI made similar efforts to wrest the accounts of Acme and Fleming Foods supermarkets, Bradlees department stores, and Circuit City consumer electronics stores from Advo; in each case Advo retained the accounts after cutting its rates substantially. In fact no major account has switched from Advo.  Thus, it is clear that to date PNI's activities have been pro-competitive, as they have resulted in lower prices.

### B. Procedural History

Advo filed its complaint against PNI on June 17, 1993, alleging that PNI was engaged in a predatory pricing scheme designed to achieve a monopoly over the Philadelphia market for circular and ROP advertising in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.  Advo requested damages, 15 U.S.C. § 15, and injunctive relief, 15 U.S.C. § 26.  The district court exercised subject matter jurisdiction over Advo's antitrust claims under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1337 (interstate commerce jurisdiction).

The parties undertook extensive discovery, including deposing at least 30 of each other's corporate officials as well as other industry experts.  Each side presented expert economic analysis.  In addition, the eight-volume appendix, running to

over 2300 pages, includes relevant documents such as business plans, annual reports, and internal memoranda.

After reviewing this voluminous record, receiving extensive briefs, and hearing oral argument, the district court on June 13, 1994, granted PNI's motion for summary judgment on the antitrust claims. Advo, Inc. v. Philadelphia Newspapers, Inc., 854 F. Supp. 367 (E.D. Pa. 1994). The court found that even if it accepted, arguendo, that PNI had engaged in predatory conduct with specific intent to monopolize, there was no dangerous probability that PNI could achieve a monopoly and maintain it long enough to recoup the costs of predation. The court reaffirmed its decision in response to Advo's motion under Fed. R. Civ. P. 59(e) for reconsideration on July 15, 1994.[2]

On August 11, 1994, Advo timely appealed from the district court's order of summary judgment and from the order denying the motion for reconsideration. We have jurisdiction under 28 U.S.C. § 1291.

## II.  Discussion
### A.  The Standard for Summary Judgment
### 1.  Predatory Pricing Suits in Particular

For its case to survive PNI's motion for summary judgment, Advo had to show that there is a "genuine issue as to

---

[2].  Because these rulings disposed of all federal questions in Advo's complaint, the court exercised its discretion and dismissed without prejudice a supplemental state law tort claim for tortious interference with prospective contractual relations.

[a] material fact" that, if decided in its favor, would legally entitle it to prevail on its attempted monopolization claim. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-26, 106 S.Ct. 2548, 2552-54 (1986).  The Supreme Court's decision in Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348 (1986), led some to believe that there was a special summary judgment standard for antitrust cases in general, or for predatory pricing cases in particular.  In Matsushita, the Court reversed this court and held that we erred in reversing a summary judgment which the district court granted to the defendants in a predatory pricing suit.  Expressing skepticism about the rationality of predatory pricing schemes, the Supreme Court reasoned that "if the factual context renders [an antitrust plaintiff's] claim implausible-if the claim is one that simply makes no economic sense-[the plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary."  Id. at 587, 106 S.Ct. at 1356 (citations omitted).

Other language in the opinion, however, demonstrated that the Court grounded its reasoning in the general standard for summary judgment under Rule 56.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial," id (internal quotations omitted).  See also Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230-32 (3d Cir.), cert. denied, 114 S.Ct. 554 (1993).  If there was

any doubt about the matter, the Court settled it in Eastman Kodak Co. v. Image Technical Serv., Inc., 112 S.Ct. 2072, 2083 (1992):

> The Court's requirement in Matsushita that the plaintiffs' claim make economic sense did not introduce a special burden on plaintiffs facing summary judgment in an antitrust case . . . . Matsushita demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated in that decision. If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.

In its most recent predatory pricing case, the Court indicated that summary judgment will be appropriate in a host of specific contexts. "In certain situations—for example, where the market is highly diffuse and competitive or where new entry is easy, or the defendant lacks adequate excess capacity to absorb the market share of his rivals and cannot quickly create or purchase new capacity—summary disposition of the case is appropriate." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 113 S.Ct. 2578, 2589 (1993).[3]

---

[3]. While the plaintiff in Brooke Group alleged "primary line" price discrimination under the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), the Court made clear that such price discrimination was factually identical to predatory pricing and thus that the analysis in the opinion applies as well to predatory pricing suits under section 2 of the Sherman Act.

> [P]rimary-line competitive injury under the Robinson-Patman Act is of the same general character as the injury inflicted by predatory pricing schemes actionable under § 2 of the Sherman Act . . . [T]he essence of the claim under either statute is the same: A business rival has priced its products in an

Matsushita caused some confusion because it in effect created a legal presumption, based on economic logic, that predatory pricing is unlikely to threaten competition.  The Court, citing a long list of scholarly works, found that "there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful."  Matsushita, 475 U.S. at 589, 106 S.Ct. at 1357; see also Brooke Group, 113 S.Ct. at 2589 (citing this passage from Matsushita).  In a nutshell, economic analyses stress that (1) predatory pricing, unlike collusion or merger, involves an expensive "investment in predation," since presumably the predator will have to price below costs; (2) this investment must be more than offset by discounted future monopoly profits; and (3) the ability to

(..continued)
> unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market.
>
> Accordingly, whether the claim alleges predatory pricing under § 2 of the Sherman Act or primary-line price discrimination under the Robinson-Patman Act, two prerequisites to recovery remain the same.
> [1.] [prices] below an appropriate measure of a rival's costs . . .
> [2.] a demonstration that the competitor had a reasonable prospect, or, under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices.

Brooke Group, 113 S.Ct. at 2587-88.

Advo could not make a claim under the Robinson-Patman Act, since the Act applies only to commodities and not services like advertising.

maintain a monopoly for long enough to recoup an investment in

predation is uncertain, since supracompetitive prices will

attract new entrants (or returning competitors).[4]

Empirical studies support these theoretical insights.
While it once was believed widely that turn-of-the-century
"robber barons" commonly practiced predatory pricing to eliminate
competitors, research over the last few decades has exposed this

---

[4]. Some recent work has demonstrated that predatory pricing may
be viable in a limited number of special situations. See, e.g.,
Jonathan Baker, Predatory Pricing After Brooke Group: An Economic
Perspective, 62 Antitrust L.J. 585 (1994).

Baker provides a typical situation where predatory
pricing might work:

> Suppose a chain store faces a non-chain rival
> in each of a large number of towns. The
> chain cuts its prices drastically in a few
> towns. When the chain's rivals in those
> towns either exit or begin to compete less
> aggressively with the chain, the price war
> ends and high prices are restored. In
> addition, the chain store's rivals in all the
> other towns, in which the chain did not cut
> prices, also respond by avoiding aggressive
> competition with the chain. As a result
> prices also increase in the towns in which
> predation did not occur.

Id. at 590. Predation makes economic sense in such cases because
the predator needs to make a relatively small investment (below-
cost prices in only a few markets) in order to reap a large
reward (supracompetitive prices in many markets).

Advo, however, has made no argument that PNI's
predation is anything like this special case where price
predation is economically sensible. This is probably because the
facts of this case do not fit under such a theory. PNI competes
in only one market, and Advo presents no evidence that PNI's
parent, Knight-Ridder Corporation, is using Advo as an example
for competitors it faces in other markets.

belief as a myth.  For instance, a seminal article demonstrated that John D. Rockefeller invariably used mergers, and not predatory pricing, to lessen competition in the oil industry.[5]

Based on this combination of economic logic and empirical verification, the Court has concluded that "economic realities tend to make predatory pricing conspiracies self-deterring:  unlike most other conduct that violates the antitrust laws, failed predatory pricing schemes are costly to the conspirators."  Matsushita, 475 U.S. at 595, 106 S.Ct. at 1360.  "[I]f [the alleged predators] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."  Id. at 596-97, 106 S.Ct. at 1361.[6]

Erroneous jury verdicts for plaintiffs in predatory pricing cases pose a unique threat.  "[C]utting prices in order to increase business often is the very essence of competition.

---

[5].  John S. McGee, Predatory Price Cutting: The Standard Oil (N.J.) Case, 1 J. Law & Econ. 137, 168-69 (1958).  See also Morris Adelman, A&P: A Study in Price-Cost Behavior and Public Policy (1966) (showing that national supermarket chain did not engage in predatory pricing to eliminate local rivals); Kenneth G. Elzinga, Predatory Pricing: The Case of the Gunpowder Trust, 13 J. Law & Econ. 223, 240 (1970) (showing that gunpowder manufacturers did not use predatory pricing to achieve monopoly power).  The Supreme Court has cited approvingly the empirical work of McGee and others, Matsushita, 106 S.Ct. at 1357.

[6].  Matsushita involved alleged predatory pricing conspiracies among a group of oligopolistic defendants.  Nevertheless, the Court in Matsushita expressed equal skepticism about the plausibility of predatory pricing by a single defendant.  "These observations apply even to predatory pricing by a single firm seeking monopoly power."  Matsushita, 475 U.S. at 590, 106 S.Ct. at 1357 (emphasis in original).

Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect."  Matsushita, 475 U.S. at 594, 106 S.Ct. at 1360.  "[C]ourts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct."  Id. at 593, 106 S.Ct. at 1359.  We cannot ignore the danger of chilling competition in this case, since PNI's acts clearly have benefited consumers, in the short run at least, with lower prices.  There are antitrust problems only if PNI has the intent and the power to harm these consumers in the long run.

### 2. Burden on Advo in General

The United States, in its amicus brief, claims that we stated in Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993), that summary judgment is inappropriate where plaintiffs have "advanced even a 'mere scintilla' of evidence" in support of their theory of recoupment.  Br. at 12.  This statement perplexes us as it misstates the holding in Big Apple.  The relevant passage in Big Apple explicitly requires more:  "if the opponent [to a summary judgment motion] has exceeded the 'mere scintilla' threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent."  974 F.2d at 1363 (emphasis

added).  See also Petruzzi's IGA, 998 F.2d at 1230.  In keeping
with Rule 56(c) and Celotex, we clearly stated in Big Apple that
a plaintiff cannot survive summary judgment unless it can produce
more than a "scintilla" of factual support for their theory of
legal recovery.

To summarize, then, in order to establish a "genuine
issue" that entitles it to reach trial on its attempted
monopolization claim premised on predatory pricing, Advo must
present more than a scintilla of evidence that the alleged
predatory conduct makes economic sense.  In this appeal, the main
hurdle for Advo is to show that PNI reasonably could expect to
recoup an investment in the predatory pricing of distribution of
circular advertising.

## B. Elements of Predation

"[I]t is generally required that to demonstrate
attempted monopolization a plaintiff must prove (1) that the
defendant has engaged in predatory or anticompetitive conduct
with (2) a specific intent to monopolize and (3) a dangerous
probability of achieving monopoly power."  Spectrum Sports, Inc.
v. McQuillan, 113 S.Ct. 884, 890-91 (1993).  See also Barr Labs.
Inc. v. Abbott Lab., 978 F.2d 98, 112 (3d Cir. 1992).  The
district court assumed arguendo that Advo had demonstrated that
there were genuine issues of material fact surrounding the first
two elements of its attempted monopolization case:  predatory
conduct, in the form of predatory, below-cost pricing; and

specific intent to monopolize.  It nonetheless found no dangerous probability that PNI could achieve monopoly power.

While we concur with the district court's conclusion, see § II.B.3 infra, we first examine Advo's evidence on predatory conduct and specific intent.  We find that Advo failed to produce evidence sufficient to survive summary judgment on any of the three elements of its attempted monopolization claim against PNI.

### 1. Below-Cost Pricing

"[P]redatory pricing means pricing below some appropriate measure of cost."  Matsushita, 475 U.S. at 584 n.8, 106 S.Ct. at 1355 n.8 (internal quotation marks omitted).  Yet "[t]here is a good deal of debate, both in the cases and in the law reviews, about what 'cost' is relevant in such cases," id., and "[n]o consensus has yet been reached on the proper definition of predatory pricing in the antitrust context . . . ."  Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 117 n.12, 107 S.Ct. 484, 493 n.12 (1986).  The Supreme Court, however, recently reaffirmed that "the reasoning in both [Matsushita and Cargill] suggests that only below-cost prices should suffice, and [that it has] rejected elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws."  Brooke Group, 113 S.Ct. at 2588.  In Brooke Group, the Court accepted for the purposes of the case the parties' agreement to use average variable cost, but "again

decline[d] to resolve the conflict among the lower courts over the appropriate measure of cost." Id. at 2587 n.1.

Under microeconomic theory, the most important measure is marginal cost ——— the cost of producing each incremental unit of output. As long as a firm's prices exceeds its marginal cost, each additional sale decreases losses or increases profits. Such pricing is presumably not predatory.

Like many economic abstractions, marginal cost is difficult to measure. The most widely cited approach to dealing with this problem, Phillip Areeda & Donald F. Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697, 716-18 (1975), divides costs into two categories: fixed costs that do not vary with the level of output (e.g. interest on borrowings, insurance premiums), and variable costs that do vary with the level of output (e.g. overtime wages, electricity bills, material costs). Because it is practically impossible to calculate the portion of variable costs attributable to each additional unit of output, Areeda and Turner argue that courts should use average variable cost as a proxy for marginal cost.

Regardless of the measure of a defendant's costs on which a plaintiff premises a predatory pricing claim, a plaintiff cannot anchor its case on theoretical speculation that a defendant is pricing below that measure. Indeed, "[a]s a practical matter, it may be that only direct evidence of below-cost pricing is sufficient to overcome the strong inference that rational businesses would not enter into conspiracies such as

this one."  Matsushita, 475 U.S. at 584 n.8, 106 S.Ct. at 1355 n.8 (emphasis added).[7]

Despite extensive discovery, Advo apparently is unable to produce any direct evidence that PNI offered to distribute circulars at prices below any relevant measure of cost.  As a key step of his analysis, Advo's economic expert states that "[a]verage variable costs for [PNI's TMC program] were estimated."  App. at 1630 (emphasis added).  The basis for these estimates is weak.  For instance, with no more foundation than a statement by PNI's publisher that inserting circulars involves "extensive costs," the expert concluded that PNI "potentially vastly understated" this variable cost.  Other components of the expert's cost estimates similarly lack a factual basis.

As Brooke Group makes clear, expert testimony without such a factual foundation cannot defeat a motion for summary judgment.  "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict . . . .  Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."  Brooke Group, 113 S.Ct. at 2598.  Advo failed to present facts establishing a genuine issue over whether PNI priced circular advertising distribution

_____

[7].  As we explain in note 6 supra, the Court's use of the word "conspiracy" here in no way limits the application of this language to Sherman Act section 1 cases.

services below some measure of costs.  This omission provided
sufficient grounds for granting summary judgment.

### 2. Specific Intent to Monopolize by Predation

In addition to demonstrating predation, plaintiffs
alleging monopolization under section 2 must produce intent
evidence.  Courts sometimes infer specific intent directly from
proof of below-cost pricing.  Inasmuch as Advo failed to create a
genuine issue over pricing, however, it needed to prove specific
intent by other means.  Its two attempts, based on (1) statements
in internal PNI documents, and (2) PNI's alleged targeting of
Advo's key customers, are not sufficient to withstand PNI's
motion for summary judgment.

Antitrust plaintiffs often establish specific intent
with "smoking gun" documents that articulate antitrust scienter
in no uncertain terms.  Advo found no such documents; instead, it
attempted to cut and paste unrelated and innocent clauses
together to produce guilty declarations.  To take one example,
Advo misrepresents that PNI's TMC Business Plan states that:

> [T]he 'ultimate benefit' of the TMC program
> was that PNI would be the 'one-stop buy,'
> i.e. the only competitor left, in the eight
> county Philadelphia market when rates would
> become 'upwardly adjustable.'

Appellant's Br. at 24.  The phrases "ultimate benefit" and "one-
stop buy" do occur in the same sentence in the plan, app. at 738,
and correctly portray PNI's overall objective.  The phrase

"upwardly adjustable," however, comes eight paragraphs later, app. at 739, as the discussion progresses from an overview of the plan to the nuts and bolts of various hypothetical business scenarios. PNI used the phrase "upwardly adjustable" in a scenario in which it assumed that prices "are deemed to be very competitively set . . . ." This is a far cry from an admission that it was charging predatory prices to start with, or that it planned to charge monopolistic prices in the future.

Advo officials themselves have used aggressive-sounding language. Its CEO, Robert Kamerschen, once directed his managers "to seize the OPPORTUNITY inherent in the stumbling PROBLEMS of the newspaper industry," and quoted McDonald's founder Ray Kroc for the advice that "[w]hen [you] see the competition drowning, . . . stick a water hose down their throats." App. at 459.

The antitrust statutes do not condemn, without more, such colorful, vigorous hyperbole; there is nothing to gain by using the law to mandate "commercially correct" speech within corporate memoranda and business plans. Isolated and unrelated snippets of such language "provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition." Morgan v. Ponder, 892 F.2d 1355, 1359 (8th Cir. 1989). We thus conclude that nothing quoted from PNI's internal documents displays PNI's specific intent to monopolize the market for distribution of circular advertising.

Advo's claim that PNI's "targeting" of its key accounts demonstrates such specific intent is similarly unavailing. As we discussed supra § I.A.1, circular advertising distributors need

"base players," that advertise frequently and on a large scale, to cover their high fixed costs.  Inasmuch as there are relatively few base players in the Philadelphia market, any firm competing in the market for distribution of circular advertising necessarily would try, as a first step, to wrest one or more of these large accounts away from Advo.  PNI's proposals to Advo's largest customers are exactly what we would expect from a legitimate competitor.  That such behavior also might be consistent with predation does not mean that Advo can survive PNI's motion for summary judgment.  "If [seemingly predatory] conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." Matsushita, 475 U.S. at 596-97, 106 S.Ct. at 1361.

### 3. Dangerous Probability of Recoupment

Finally, we concur with the district court's determination that Advo failed to establish a genuine issue of material fact about PNI's ability to recoup any investment made in predation (§ II.B.3.a infra).  The Supreme Court instructs that "[i]f market circumstances or deficiencies in proof would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, the plaintiff's case has failed."  Brooke Group, 113 S.Ct. at 2589. The district court found, in effect, that "[t]he evidence is inadequate to show that in pursuing this scheme, [PNI] had a reasonable prospect of recovering its losses from below-cost pricing," id. at 2592.  We agree.

In addition, we reject Advo's theories that PNI can scare away potential entrants by "strategic deterrence" (§ II.B.3.b infra), or can "leverage" its monopoly over ROP advertising to gain a monopoly over the distribution of circular advertising (§ II.B.3.c infra). Finally, we find no support for Advo's theories for how PNI could recoup an investment in predation via either price discrimination (§ II.B.3.d infra) or long-term contracts (§ II.B.3.e infra).

### a. Low barriers to entry

For the purposes of this section, we accept the contention that PNI is pricing below cost, with specific intent to obtain a monopoly in the distribution of advertising circulars. We further assume, arguendo, that it will be able to complete successfully the first stage of its plans by eliminating Advo and all other competitors from the Philadelphia market. But, as we discussed supra § II.A, in order to defeat the motion for summary judgment Advo must demonstrate that PNI has a dangerous chance to recoup the losses it necessarily would incur in pricing below cost.

If it is easy to enter the circular distribution business, PNI's scheme is doomed to failure: any attempt to recoup by charging supracompetitive prices after it has gained a monopoly simply will attract new (or old) distributors who will undercut PNI and force prices back down to competitive levels. Predatory pricing schemes that fail at the recoupment stage may injure specific competitors like Advo, but do not injure

competition (i.e. they do not injure consumers) and so produce no antitrust injury.  See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 487-90, 97 S.Ct. 690, 697 (1977).  Such futile below-cost pricing effectively bestows a gift on consumers, and the Sherman Act does not condemn such inadvertent charity.

In deciding that low barriers to entry would defeat any attempt by PNI to recoup an investment in predation by raising prices, the district court properly analyzed the specific features of the Philadelphia market for circular advertising.  "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market."  Spectrum Sports, 113 S.Ct. at 891.

We do not see the difficulty of entering the business of assembling and distributing bags of advertising circulars, whether by mail or door-to-door.  The inputs required are readily available: a small cadre of experienced managers; a sales force; computerized address lists available from a variety of vendors; and a large number of low-skill employees to stuff circulars into packets, and then either to stuff them into newspapers or hang them on doorknobs.

Nobody has a monopoly over any of these commonly-available goods and services.  Managers with experience in the circular advertising distribution business are probably the scarcest of the requirements, but if Advo exited the Philadelphia market, a new entrant might be able to hire its local management

team.  The Supreme Court has observed that driving a competitor out of business may do no more than allow a new entrant to buy up the idled physical and human capital at bargain prices.  See Cargill, 479 U.S. at 119 n.15, 107 S.Ct. at 494-95 n.15.  In any event, the business involved here hardly is of a highly sophisticated nature.

High capital requirements also pose no barrier to entry.  The total start-up investment, based on CBA's successful entry into the Philadelphia market, is a couple of million dollars.  While this sum is not trivial, it is not so high that it would prevent new competitors from jumping in if PNI tried to charge supracompetitive prices.[8]

Advo itself made substantially all of these points in defending against a similar claim ten years ago, Cassidy Distrib. Serv., supra § I.A.2.  According to Advo's expert in that case, "[e]ntry into the market [for distribution of circular advertising] is comparatively easy.  Little initial capital is required relative to many other businesses.  Mailing lists and operational expertise are available from many sources."  Revised Preliminary Report of Dr. Almarin Phillips, app. at 2345.[9]  In

---

[8].  It is also noteworthy that Advo may have deeper pockets than PNI.  Although it is difficult to extract financial information for PNI from the annual report of its parent corporation Knight-Ridder, we can ascertain that Advo's revenues in 1992, $910,000,000, were more than double those of PNI, $422,000,000.  While it is true that Knight-Ridder's 1992 revenues, $2,300,000,000, were in turn more than twice those of Advo, Advo's theory of recovery focuses exclusively on the PNI subsidiary.

[9].  Advo has not objected to PNI's reliance on Phillip's report on the possible ground that the report was not admissible

addition, Advo's expert in the Cassidy case noted two other sources of competition. First, advertisers, individually or as a group, could form their own circular distribution ventures if a monopolistic vendor raised prices significantly. Second, unconventional shared mail vendors, such as utilities and credit card companies that send out bills every month, would become more attractive if conventional sellers overprice their services.

Advo tries to distance itself from its position in Cassidy by arguing that conditions in the Philadelphia market have changed in the intervening years. While Advo arguably shows that CBA might be unable to repeat its 1989 entry today due to increased competition and PNI's altered delivery schedule, it fails to undermine any of the observations it made in Cassidy: the business is simple, capital requirements are not excessive, and there are a variety of ways to compete in the market for distributing circulars.

Although Advo did not mention "know-how" or credibility in the Cassidy case, it now claims that these factors present significant barriers to entering the circular distribution business. We agree with the district court that these arguments are unconvincing. In the words of Advo's economic expert, the know-how barrier stems from "the substantial efforts that must be undertaken to obtain the necessary business . . . the experience required for ensuring the delivery of preprinted advertising to

(..continued)
evidence on the motion for summary judgment and thus we do not address that question.

over 2,300,000 households on a weekly basis (on a given day of the week), and coordinating the logistics associated with ensuring quality control and customer satisfaction." App. at 1615.

Oddly, Advo claims that the complexity of PNI's TMC Plan proves that know-how is a significant barrier to entry. To the contrary, the fact that PNI was able to plan and implement (according to Advo's pleadings) an effective plan in less than a year shows that entry into the circular distribution business does not require extraordinary know-how. Beyond the bald assertions of its expert, that are without factual significance, Brooke Group, 113 S.Ct. at 2598, Advo presents no evidence that its business requires know-how any different from other businesses. Indeed, the record indicates that circular distribution is relatively simple. Tellingly, Advo cites only two dated district court decisions arguing that know-how can be a significant barrier to entry.[10] In any event, the value of precedent on this point is limited, as the importance of know-how can be determined only in the context of a particular business.

Advo also emphasizes the need for a reputation for providing reliable service as a barrier to entering its business. This approach, however, proves too much. New entrants and customers in virtually any market emphasize the importance of a

---

[10]. Marnell v. United Parcel Svc., Inc., 1971 Trade Cas. (CCH) ¶ 73,761 (N.D. Cal. 1971); Kennecott Copper Corp. v. Curtiss-Wright Corp., 449 F. Supp. 951, 965 (S.D.N.Y), aff'd in part, rev'd in part on other grounds, 584 F.2d 1195 (2d Cir. 1978).

reputation for delivering a quality good or service.  Federal Express had to establish a strong reputation for on-time delivery in order to create an entire new industry; because of its reputation McDonald's has flourished despite having numerous competitors.  The number of examples is extensive.

Advo's argument, without some limiting principle (that it fails to supply), implies that there are barriers to entry, significant in an antitrust sense, in all markets.  We find this proposition implausible and, moreover, precluded by Supreme Court precedent.  See Brooke Group, 113 S.Ct. at 2589 (suggesting summary judgment is appropriate in predatory price suits "where new entry is easy," implying that there are easy-entry markets); see also Matsushita, 475 U.S. at 591 n.15, 106 S.Ct. at 1358 n.15 ("Respondents offer no reason to suppose that entry into the relevant market is especially difficult . . . .").  While we do not question the judgment of other courts of appeals that in other market contexts reputation is a significant barrier to entry,[11] Advo has failed to create a genuine issue over the existence of barriers to entry in this case.

We also point out that the reputation may be of only marginal significance where there are only a limited number of

_____

[11].  See Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566, 1577 (11th Cir. 1191) (finding "goodwill," a partial synonym for reputation, could be barrier to entry in real estate listings market), cert. denied, 113 S.Ct. 295 (1992); U.S. Philips Corp. v. Windmere Corp., 861 F.2d 695, 703 (Fed. Cir. 1988) (finding that "the need to have a well-known brand with wide consumer acceptance" amounted to a barrier to entering the market for rotary electric shavers), cert. denied, 490 U.S. 1068, 109 S.Ct. 2070 (1989).

consumers for a service as is the case here.  After all, a new entrant need only convince a few businesses to use its services for it to be successful in the circular distribution business. Thus, this case differs from a situation in which the competitors seek their customers in a large retail market.

Assessing barriers to entry is not an easy task.  In the ideal world of neoclassical economics, the implicit assumption is that there are no such barriers.  Of course in real world markets this assumption never holds and new entrants face a variety of hurdles.  The question is, how far from the economic ideal do the special features of a given market take us?  We agree with the district court that neither know-how nor reputation make entry into the market for distributing circular advertising so difficult that PNI could charge supracompetitive prices for a significant period of time.  Thus competition would prevent PNI from recouping the cost of predation.  In the next four subsections, we explain that "strategic entry deterrence," PNI's monopoly power in the ROP market, its ability to engage in price discrimination, and its use of supposedly long-term contracts do not alter this conclusion.

### b. Strategic entry deterrence

The idea behind "strategic entry deterrence" is that a monopolist who pursues predatory pricing with sufficient zeal and frequency will earn a reputation formidable enough to scare off all potential entrants indefinitely.  The firm then can charge monopolistic prices long enough to recoup its investment in

predation.  Like Advo's arguments that know-how and reputation create barriers to entry, its strategic entry deterrence theory sweeps too broadly.  Without some limiting principle, it would bar summary judgment in every predatory pricing case, a result at odds with Matsushita and Brooke Group.

As a matter of economics, ease of entry makes the threat implicit in strategic entry deterrence non-credible.  Potential competitors will realize that at some point the predatory firm will be unable or unwilling to charge below-cost prices and absorb further losses, since nobody's pockets are bottomless.  High prices will attract a stream of competitors who eventually will sap the predator's bank account.

### c. Leveraging ROP market power

PNI alone distributes newspapers across the entire Philadelphia market, and we assume that it has a monopoly over ROP advertising in the metropolitan area taken as a whole.  Advo claims that PNI offered discounted ROP rates to customers placing circulars in its TMC program.  Advo argues that such "leveraging" of existing monopoly power in an attempt to gain monopoly power over a related market amounts to anticompetitive conduct in violation of the Sherman Act.

While such leveraging arguments have long been a staple of antitrust suits, they have come under increasing attack as economically groundless.[12]  They appear to be based on analysis

---

[12].  Robert H. Bork, The Antitrust Paradox 372-73 (2d ed. 1993); Richard A. Posner, Economic Analysis of Law § 10.10 (4th ed.

akin to the myth that a monopolist can charge any price it wants. That, of course, is not true; an exclusive seller will raise prices only to the point where the higher price is not more than offset by a decrease in quantity demanded. The shape of the demand curve constrains the behavior of all sellers, even monopolists.

Similarly, leveraging arguments like Advo's imply that a monopolist somehow magically can multiply monopoly power in one market into monopoly power in two markets. This makes no sense. PNI's monopoly in the Philadelphia market for ROP is worth so much a year, say $X. The simplest way for PNI to exploit this monopoly is to set ROP price and output levels so that its supracompetitive profits on ROP advertising are $X. Advo alleges that instead, PNI is lowering the price of ROP advertising (and thus raising quantity) in an attempt to gain circular advertising business. In the extreme, it is possible that PNI could charge competitive prices for (and produce a competitive quantity of) ROP advertising, and use the entire value of its ROP monopoly to increase its circular market share.

The question is, what would PNI accomplish by such a strategy? Even if it successfully monopolizes the circular distribution advertising market by investing the proceeds from its ROP monopoly in predation, it will be unable to recoup those profits as long as there are low barriers to entering the

(..continued)
1992); Richard Markovitz, Tie-ins, Leverage, and the American Antitrust Laws, 80 Yale L.J. 195 (1970).

circular distribution market.  Any attempt to earn back the foregone profits by charging monopoly prices on distribution of circular advertising, as we discussed supra § II.B.3.a, merely will lead to a wave of new entrants who will drive prices down to competitive levels.

The Supreme Court has recognized this point.  In Matsushita, the plaintiff American producers claimed that their Japanese competitors had a monopoly over the Japanese domestic television market and were using the profits derived in Japan to fund a predatory pricing scheme in America.  The Supreme Court, taking these propositions as true, found no antitrust problem since the defendants were unlikely to recoup their foregone profits:

> Nor does the possibility that petitioners have obtained supracompetitive profits in the Japanese market change this calculation. Whether or not petitioners have the means to sustain substantial losses in this country over a long period of time, they have no motive to sustain such losses absent some strong likelihood that the alleged conspiracy in this country will eventually pay off.

Matsushita, 475 U.S. at 593, 106 S.Ct. at 1359 (emphasis in original).

Even if we agreed that PNI somehow could multiply its monopoly power in the ROP market because of some unusual interdependency with the circular distribution market, there is little, if any, evidence that it attempted to use leverage.  The record shows that PNI simply offered discounts based on the total

amount of advertising purchased by a customer.  PNI did not threaten to deny ROP service to customers that refused to place their circular distribution business with it, nor did PNI grant extraordinary discounts for customers of its TMC program.  PNI's discounts, based on the total amount of dollars spent by a customer, offend no antitrust principles.[13]  Such "total quantity" discounts distinguish this case from SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056 (3d Cir.), cert. denied, 439 U.S. 838, 99 S.Ct. 123 (1978), where we found that discounts tied to the purchase of specific items might amount to unlawful leveraging of monopoly power.

### d. Price discrimination

Advo claims that PNI can recoup its investment in predation by charging high prices to small accounts, while retaining base players with lower, competitive prices.  It asserts that PNI's ability to retain base players with low (but above cost) prices will deter new entrants.

What Advo wishes to characterize as price discrimination is, again, nothing more than quantity discounting. A host of Advo assertions to the contrary are without foundation. Advo claims that "PNI does not afford non-base players such benefits," Br. at 22, but cites no record support.  It buttresses its assertion that "PNI further discriminates between base

---

[13].  Tellingly, Advo offers precisely the same kinds of discounts; e.g. customers who buy enough shared mail receive discounts on all other services purchased from Advo.

players and non base players by giving the base players large discounts off the published price," Br. at 22, with no less than four cites to the appendix, but none of the cited material provides any real support. Finally, Advo contends that "PNI offered the special ROP discounts only to Advo base players." Br. at 23 (emphasis added). Although it gives three cites to the appendix, none remotely support this crucial assertion. The record indicates that PNI offered quantity discounts to all customers on an equal basis. Such common commercial practice does not offend the Sherman Act.

In addition, our ease of entry analysis, supra § II.B.3.a, applies to small buyers as well as base players. If PNI tried to charge supracompetitive prices to smaller accounts, we see no economic reason why new entrants could not successfully gain this business by charging lower prices. Indeed, suburban newspapers are an existing source of competition for many local retailers, and most of these local publications have implemented programs to reach non-subscribing households. We previously rejected Advo's theory of predation in Barr Labs., 978 F.2d at 108. The plaintiff in Barr claimed the defendant was selling at low prices to big drug store chains, but charging more to smaller retail pharmacies. We questioned the economic logic of this claim, noting that "competitors would step in with lower prices [to small retailers] to defeat Abbott's strategy."

### e. Long-term contracts

We also find no merit in Advo's claim that PNI plans to monopolize the circular advertising market by signing long-term (two-year) contracts with base players. We begin by noting that contracts to purchase are never per se violations of the antitrust laws, even in their most restrictive forms. Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 333, 81 S.Ct. 623, 631 (1961). The proposed two-year contracts were not highly restrictive; they were neither requirements contracts compelling buyers to purchase all of their circular advertising from PNI, nor did the offers contain exclusionary clauses barring advertisers from dealing with other vendors.

Moreover, there is clear evidence in the record that one- and two-year contracts are standard in the industry. App. at 1616. CBA, now owned by Advo, had a two-year contract with Super Fresh. App. at 1965-66. Indeed, in its brief, Advo flatly states that "[b]ase players typically purchase preprint distribution through long-term contracts of twelve months or more." Br. at 22. Since PNI's proposed contract length, two years, did not depart from standard industry practice, Advo in effect must be claiming that all distributors of circular advertising engage in exclusionary behavior by using long-term contracts. It provides no support for this improbable conclusion.

We note also that base players are not small, unsophisticated entities likely to sign contracts of adhesion in favor of PNI. They are major regional and national retailers who presumably do not enter into agreements unless the terms are in

their interests.  These retailers have proved to be keenly aware of supracompetitive pricing for distribution of circular advertising, and explicitly have invited competitors to enter the market when they felt prices were excessive.  It is unlikely that they would agree to a deal that permitted PNI to sock it to them down the road.

While it is true that PNI internal documents discuss a desire to "lock up" base players with "multi-year" contracts, app. at 1137-38, this is merely another example of harmless commercial rhetoric that we discussed supra § II.B.2.  It is of no antitrust significance.

## III. Conclusion

We close with the following observation.  There can be little doubt but that PNI's adoption of the TMC program has resulted in lower prices for distributing advertising circulars in the Philadelphia market.  Yet Advo would have us condemn PNI because of what Advo contends, without basis, will be the long-range consequence of PNI's actions.  We reject Advo's argument.  This case is a text-book example of a situation in which a plaintiff is, in the words of Matsushita, using the antitrust laws in an attempt to chill the very conduct the laws were designed to protect.

Accordingly, because the district court correctly determined that PNI had no reasonable prospect of recouping any investment made to obtain predatorily a monopoly in the market for distributing circular advertising, we will affirm its order

of June 13, 1994, granting summary judgment against Advo and its order denying reconsideration on July 15, 1994. As additional ground for affirming, we find that Advo failed to establish a genuine issue of material fact to support its case on the other two elements of its Sherman Act section 2 claims, predatory conduct and specific intent to monopolize. Finally, we note that the district court did not abuse its discretion in dismissing the state-law tortious interference with contractual relations claim once it had resolved all substantial federal questions in the case.

ADVO, INC. v. PHILADELPHIA NEWSPAPERS, INC.,
No. 94-1812

STAPLETON, Circuit Judge, concurring:

I agree with the court's conclusion regarding one of the case dispositive issues presented in this appeal. Advo failed to establish a genuine issue of material fact as to whether there was a dangerous probability that PNI would recoup its alleged investment in predation. I write separately because my reasons for reaching that result differ somewhat from those offered by the court.

Advo bore the burden of establishing a genuine issue of material fact on the recoupment issue. To meet this burden, Advo attempted to show that various impediments to market entry or reentry would tend to keep potential competitors out of the

market long enough for PNI to recoup its investment in predation through the charging of supracompetitive prices.  Advo's task of presenting a record that would permit a rational factfinder to so conclude was made substantially more difficult by PNI's evidence establishing that CBA, as recently as 1989, had successfully entered the market in well under a year during a period when no one was charging supracompetitive prices.  Advo attempted to meet the challenge presented by CBA's entry by pointing to evidence which tended to show that there are barriers in the market today which were not present when CBA entered the market.

Advo no doubt has presented facts from which a rational jury could infer that various market factors would tend to impede market entry or reentry.  Showing that various factors might impede market entry is not enough, however.  Summary judgment is appropriate here because Advo has failed to provide a rational basis for an inference that the various market-entry impediments are <u>substantial enough</u> to deter entry for a period sufficient to permit recoupment through the charging of supracompetitive prices.

Having concluded that Advo failed to meet its burden on the recoupment issue, I would not reach the issues of whether Advo met its burdens on the predatory-pricing or specific-intent-to-monopolize elements of its § 2 claim.